## DETROIT EDISON CO. *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 675. Argued April 13, 1943.—Decided May 3, 1943.

*Mr. Norris Darrell,* with whom *Messrs. Edward H. Green* and *Oscar C. Hull* were on the brief, for petitioner.

*Mr. Arnold Raum,* with whom *Solicitor General Fahy, Assistant Attorney General Samuel O. Clark, Jr.,* and *Messrs. Sewall Key* and *J. Louis Monarch* were on the brief, for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The petitioner, The Detroit Edison Company, engages in the generation of electric energy and its distribution to the public in and near Detroit. It receives many applications for service which in its opinion would require an investment in extension of its facilities greater than prospective revenues therefrom would warrant. In such cases it undertakes to render the service if the applicant will pay the estimated cost of the necessary construction. This is done by contract of which there are five variations, some of which provide for refunds of part of the customers' cost if additional customers come in to share it, or if revenues exceed estimates. With these provisions we are not concerned, since the controversy here relates only to payments that never were, or which by the contracts have ceased to be, refundable. The amounts of the cus-

tomers' payments are fixed by an estimate of the cost; they never exceed, and sometimes fall short of actual cost, but are not adjusted because of the difference between estimates and realization.

The Company constructs the facilities, which become its property, and adds the full cost to its appropriate property accounts without deduction for the customer payment. It claims as a base for computing its depreciation the investment for which the Company is then reimbursed. Customers' payments are not appropriated to the particular construction nor earmarked for it, but go into the Company's general working funds. During the period that a payment is subject to refund it is carried in a suspense account; but if it is not subject to refund, or when the refund period is past, the unrefunded and unrefundable balances are transferred to surplus through an account designated as "Contributions for Extensions."

During 1936 and 1937, the years in question, the Company added to its surplus from such sources $36,065.81 and $47,500.67 respectively. The Commissioner eliminated from the depreciable property of the Company that portion of the cost equivalent to the unrefunded and unrefundable balances of the deposits. These eliminations, amounting to upwards of $1,160,000 in each year, resulted in disallowing depreciation deductions from income of $40,273.11 for 1936 and $41,786.26 for 1937, and in deficiencies which the Company contested. The Board of Tax Appeals sustained the Commissioner and the Circuit Court of Appeals affirmed.[1] Because the decision appeared to conflict with principles followed in another circuit,[2] we granted certiorari.

A deduction from gross income on account of depreciation is permitted by § 23 (1) of the applicable Revenue

----

[1] 45 B. T. A. 358; 131 F. 2d 619.

[2] *Arundel-Brooks Concrete Corp.* v. *Commissioner*, 129 F. 2d 762 (C. C. A. 4th).

Act in these terms: "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." [3]   For the basis we are referred by § 23 (n) to § 114 of the Act which refers us again to § 113 (b) thereof which provides an "adjusted basis" for gain or loss but which again refers us to § 113 (a) for the basis upon which adjustment is to be made.   The sum of these is that the basis of depreciation allowance "shall be the cost of such property" (§ 113 (a)) making "proper adjustment" in respect of the property "for expenditures, receipts, losses, or other items, properly chargeable to capital account," (§ 113 (b) (1) (A)) except in case of certain gifts, transfers as paid-in surplus, or contributions to capital (§ 113 (a) (2), (8) (B)), which exceptions we will later consider.

It will be seen that the rule applicable to most business property of a cost basis properly adjusted leaves many problems of depreciation accounting to be answered by sound and fair tax administration.   The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein. Or as a layman might put it, the machine in its life time must pay for itself before it can be said to pay anything to its owner. Experience and judgment hit upon usable mortality tables for classes of property from which annual rates of accrual are estimated and several different methods are employed for relating this physical deterioration and functional obsolescence to financial statements.   The calculation is influenced by too many

---

[3] Revenue Act of 1936, 49 Stat. 1648.

variables to be standardized for differing enterprises, assets, conditions, or methods of business. The Congress wisely refrained from formalizing its methods and we prescribe no over-all rules.

But we think the statutory provision that the "basis of property shall be the cost of such property" (§ 113 (a)) normally means, and that in this case the Commissioner was justified in applying it to mean, cost to the taxpayer. A property may have a cost history quite different from its cost to the taxpayer. It may have been purchased for less or more than original cost, or built by contract which called for payments on which the builder profited greatly or suffered heavy loss. But generally and in this case the Commissioner was in no error in ruling that the taxpayer's outlay is the measure of his recoupment through depreciation accruals.

If this were otherwise in doubt it would be made clear by the provisions for "proper adjustment" of cost for receipts properly chargeable to capital account found in § 113 (b) (1) (A). The customer payments so far as in question found their way into the Company's capital accounts by way of an addition to surplus. Their interdependency with the increases in property accounts caused by the construction they induced justified the Commissioner in relating the one to the other for the purpose of adjusting the basis for depreciation.

The Company, however, seeks to avoid this result by the contention that what it has obtained are gifts to it or contributions to its capital of the property paid for by the customer, and that therefore by the provisions of § 113 (a) (2) and (8) (B) it takes the basis of the donor or transferor. It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor in substance bore such a semblance.

The payments were to the customer the price of the service. The receipts have gone, so far as here involved, to add to the Company's surplus. They have not been taxed as income, presumably because it has been thought to be precluded by this Court's decisions in *Edwards* v. *Cuba R. Co.*, 268 U. S. 628, holding that under the circumstances of that case a government subsidy to induce railroad construction was not income. But it does not follow that the Company must be permitted to recoup through untaxed depreciation accruals on investment it has refused to make. The Commissioner was warranted in adjusting the depreciation base to represent the taxpayer's net investment. Nothing in the Regulations is to the contrary and nothing in *Helvering* v. *American Dental Co.*, 318 U. S. 322, when read in the context of its facts touches this problem at all.

*Affirmed.*

The CHIEF JUSTICE did not participate in the consideration or decision of this case.