**TELESERVICE COMPANY OF WYO‹ MING VALLEY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**No. 12255.**

United States Court of Appeals Third Circuit.

Argued Nov. 8, 1957.

Decided March 24, 1958.

Writ of Certiorari Denied June 16, 1958. See 78 S.Ct. 1360.

———◆———

Edward P. Morgan, Washington, D. C., (Herbert E. Forrest, Welch, Mott & Morgan, Washington, D. C., on the brief), for petitioner-appellant.

Thomas N. Chambers, Washington, D. C. (John N. Stull, Acting Asst. Atty. Gen., Harry Baum, Joseph F. Goetten, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before MARIS, KALODNER and STALEY, Circuit Judges.

KALODNER, Circuit Judge.

Were "contributions" received by the taxpayer, a television signal transmission service, from its customers, "toward the total cost of constructing" its facilities, under a contract which simultaneously provided for such "contributions" and the further payment of a "monthly maintenance charge", includable as "gross income" under Section 22(a) of the Internal Revenue Code of 1939?[1]

That is the issue presented by this petition for review of the decision of the Tax Court[2] which answered it affirmatively, thereby making the "contributions" toward the cost of construction taxable as gross income. The Tax Court's decision was premised on its "Ultimate Finding" that the "contributions" to the taxpayer " * * * were not gifts or contributions to capital; they were part of the payment for serv-

---

1. "§ 22. Gross income

"(a) *General definition.*—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit or gains or profits and income derived from any source whatever. * * *" 26 U.S.C. 1952 ed., Sec. 22.

2. 27 T.C. 722 (1957).

ices rendered or to be rendered by the petitioner [taxpayer] and are includable in petitioner's [taxpayer's] gross income."

It must immediately be noted that the "Ultimate Finding" of the Tax Court " * * * was in the nature of an ultimate finding of fact and since such finding is but a legal inference from other facts it is subject to review free of the restraining impact of the so-called 'clearly erroneous' rule applicable to ordinary findings of fact by the trial court * * *." [3]

The facts may be summarized as follows:

Teleservice Company of Wyoming Valley ("taxpayer") is a Pennsylvania corporation. It promoted, constructed and now operates for profit a community antenna television system at Wilkes-Barre and Kingston, Pennsylvania.

The residents of Wilkes-Barre and Kingston were unable by conventional television roof-top or built-in antennas to receive television signals of an adequate visual quality due to the fact that the cities are located in valleys surrounded by hills which effectively screened or cut off television signals which would otherwise be available for reception by conventional methods. Therefore, in January, 1951, the taxpayer's incorporators determined that a company should be organized for the purpose of providing television signals to the residents of the Wilkes-Barre area through a community television system.

In 1951 no licenses for Ultra High Frequency (U.H.F.) television stations (to provide a local, conventional television service to the area) had then been issued, but there were indications that such licenses would be granted in the near future, and it was known that at least one company in Wilkes-Barre would make application for such license. This created a hazard to investment of money in the enterprise contemplated by the taxpayer. In addition, taxpayer's founders determined that the construction of a community antenna system was an unknown business with no adequate precedent to follow and without definite information available on past experience.

Two community antenna systems were investigated—one in Lansford, Pennsylvania, which was observed in operation, and another in Pottsville, Pennsylvania, which was in the process of being constructed. The taxpayer was the third company of its type in existence.

After a study of some six months, the taxpayer selected a suitable location for the interception of television signals on top of the mountain range surrounding Wilkes-Barre and Kingston. It found that it would be necessary to run a trunk line of coaxial cables from the location selected to the edge of the populated area on the fringe of Wilkes-Barre, a distance of about five miles, before any significant service could be offered. This "dead" trunk line was not found in the other systems studied; it would be costly, and taxpayer was not certain it would be a success. The Radio Corporation of America (R.C.A.) provided engineers to make a survey of the projected system, and furnished estimates of the cost of the equipment and materials that would be required. On the basis of the experience of the two other community antenna systems and the advice received from R.C.A. it was estimated that it would cost 96 cents per foot for the trunk line cable or feeder line cable to be installed and erected. This cost tended to be constant, regardless of the size of the system, since the only fixed cost was that of constructing the antenna tower atop the mountains which was relatively small—$1,500 to $3,000. It was calculated that the cost of constructing a system to serve Wilkes-Barre and Kingston would be as much as $250,000.

Before construction was begun or money paid into its treasury by its founders, the taxpayer decided that construction of the system would have to be financed essentially through contributions from prospective customers or subscribers since it would be too great a risk for it to undertake the entire investment and that, in any event, it would be impossible

3.  Philber Equipment Corporation v. Commissioner, 3 Cir., 1956, 237 F.2d 129, 131.

for it to realize a profit should it do so. It determined that whatever profit it might realize from the venture would come from monthly service charges.

Under the program formulated by the taxpayer contributors were divided into two classes—residential and commercial. The residential customers were to be required to make contributions of $145.00; the commercial customers $200.00. These varying scales were fixed by the taxpayer because, although service installation costs were the same with respect to both classes of customers, it believed that the commercial establishments could afford to contribute a greater amount than could a private individual. In fixing the amount of the contributions to be made by customers the taxpayer took into consideration its estimated construction costs and amounts solicited by other community systems. In this connection taxpayer estimated that the contributions, if it obtained the number of customers anticipated, would just about balance the costs of construction of its entire system.

The taxpayer's program also provided that residential customers were to pay $4.00 monthly and commercial customers $6.00 monthly as a service or maintenance charge in addition to their initial contributions. The monthly charges were designed to cover the maintenance of the community system and included an element of profit to the taxpayer. The rates were not set by any regulatory commission.

The taxpayer's system was constructed in several distinct stages. The first step was the erection of a tower and intercepting antennas and the installation of a main trunk line cable, approximately five miles in length, to the first distribution area. The cost of this first stage, $24,138.49, was advanced by the taxpayer's incorporators.

On completion of this first step potential subscribers were solicited. When a sufficient number of applications for service had been received to indicate that further extension of the system would be feasible the taxpayer entered into contracts with subscribers and then proceeded with construction in the area in which they were located. Six months elapsed after completion of the initial construction before the first extension of the system was undertaken. Thereafter, the delay between extensions was substantially reduced.

Upon acceptance of an area for the extension of service, taxpayer entered into contracts with the subscribers. Taxpayer agreed "to furnish subscriber at the place of installation * * * a television signal transmission service". The subscriber, in turn, agreed (1) to contribute the sum specified "toward the total cost of constructing a system for the transmission of a television signal" and (2) to pay "a monthly maintenance" charge which would entitle him to receive service. While a contribution was a prerequisite to eligibility to use of the system, it did not entitle the contributor to receive television signals. The contributor was required to make monthly payments, in advance, in order to receive the signals. Potential subscribers were advised that the contribution was in aid of construction of the facility for supplying the television signals, and had no bearing on the service, which would be charged as an extra item.

A contributor could not sell, assign, or transfer his eligibility to receive television signals, but he remained eligible to receive the signals without additional cost if he moved to another part of Wilkes-Barre or Kingston. However, the person who moved into the contributor's old home was required to make a contribution in order to become eligible to use the system.

The contract between taxpayer and its customers specified that it was subject to "General Provisions." The latter in turn provided, inter alia: (1) if the taxpayer by reason of its public utility contracts or governmental action found it " * * * either impossible or impractical * * * to furnish television transmission service under this contract * * * " it had the right to terminate the contract and in such event " * * *

*all contributions, maintenance rates, and other moneys paid \* \* \* by Subscriber [to it] shall be forfeited"*; (2) taxpayer could terminate its contract with the subscriber in the event of the latter's violation and that in such event *" \* \* \* Subscriber shall not be entitled to a refund of any kind \* \* \*"*; and (3) if taxpayer terminated the contract for its convenience *" \* \* \* Subscriber shall be refunded a part of his contribution money*, as follows: A maximum of Sixty (60) Dollars less Ten (10) Dollars for each month this contract has been in effect \* \* \*"*. (emphasis supplied)

No change was ever made in the $4.00 monthly charge for maintenance in the case of a residence, or in the $6.00 monthly charge in the case of a commercial establishment. Also, the $200.00 contribution required of commercial establishments was never changed. However, the amount required of residential subscribers was reduced to $89.00 on January 1, 1953; to $80.00 on June 1, 1954; to $30.00 in August, 1955, and no contributions have been required since 1956.

The greatest number of connections in operation at one time was about 900 and the least was about 200 to 300. In 1956 there were about 400 connections in operation. The decrease in connections resulted in 1952 when U.H.F. licenses were granted to local television stations in Wilkes-Barre and Scranton, Pennsylvania. The number of contributions also fell off sharply at that time.

During the period February 20, 1951, to January 31, 1952, the first tax year here involved, taxpayer received under contracts "contributions" totalling $27,-601.98; during the same period construction costs of the system totalled $62,880.64.

During the period February 1, 1952, to January 31, 1953, the second tax year here involved, taxpayer received under contracts "contributions" totalling $88,-544.79; during this period construction costs of the system totalled $70,620.78.

As reflected by the foregoing, the total cost of constructing the system amounted to $133,501.42 of which sum $116,146.77 was paid for by the "contributions" and the balance of $17,354.65 was financed with borrowed money. All of the funds received as "contributions" were applied to construction costs. Taxpayer's operating expenses were paid from sums collected from subscribers as monthly payments for maintenance and operation, under the terms of their contracts.

All initial payments received by the taxpayer were credited to an account maintained in its books and records called "Customer Contributions". Segregation of the funds paid as contributions was maintained on the books of the taxpayer, as against sums received from monthly maintenance charges. All funds were deposited in the taxpayer's general bank account from which were paid general operating expenses and the cost of all assets acquired. However, the taxpayer's accounting system segregated the costs of construction and the amounts received as contributions. The amounts received as contributions were never applied by the taxpayer to any of the expenses normally chargeable to operation. Only the monthly service charges were employed for such expenses.

Taxpayer in filing its income tax returns did not include the contributions from subscribers in its gross income. Further, it did not claim deductions upon its income tax returns for depreciation of the physical facilities of the community antenna television system but showed the accounting depreciation as a non-deductible item.

The Commissioner treated the contributions as gross income during the taxable years involved and determined a deficiency accordingly. In such determination he, however, allowed the taxpayer a deduction for depreciation of the physical assets of its system purchased with the contributions. The Commissioner's determination resulted in the tax deficiencies here in issue—$3,-210.83 for the year ended January 31, 1952, and $13,013.09 for the year ended January 31, 1953.

Taxpayer unsuccessfully petitioned the Tax Court for redetermination of the deficiencies asserted by the Commissioner. It may be noted parenthetically that the Tax Court's decision was "Reviewed by the Court" and that one judge dissented.

Sketched in sweeping outline the contentions of the taxpayer and the Government may thus be stated:

Taxpayer urges that the contributions received from subscribers here were "in aid of capital construction" and thus did not constitute "income" under what it characterizes as the basic teaching of the "doctrine" of Edwards v. Cuba Railroad Co., 1925, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124.

The Government asserts (1) the Internal Revenue Code of 1939 accords no tax exemption for "contributions in aid of capital construction"; (2) only payments which are made in the nature of gifts or capital contributions are excludable from gross income; (3) payments in aid of construction which are made in return for services rendered or to be rendered are not gifts or capital contributions and (4) the so-called "contributions" made by subscribers here actually constituted part of the price of the services to be rendered by the taxpayer. In support the Government cites Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286.

The parties agree, as did the Tax Court, that Edwards v. Cuba Railroad Co., supra, was followed by the Tax Court (and its predecessor Board of Tax Appeals) for some thirty years until the decision now under review.

The Tax Court in its opinion declared that it was compelled to the conclusion it reached under Detroit Edison Co. v. Commissioner, supra, and the doctrine of Commissioner v. Glenshaw Glass Co., 1955, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 and General American Investors Co. v. Commissioner, 1955, 348 U.S. 434, 75 S.Ct. 478, 99 L.Ed. 504. It conceded, that apart from Edwards v. Cuba Railroad, supra, which it distinguished factually,

it was unable to make similar distinction with respect to its own prior application of the Edwards decision in numerous cases. With respect to the latter it frankly stated (27 T.C. at page 729):

"In spite of the sheer weight in number of those decisions, we feel bound to make an ultimate finding consistent with that of the Detroit Edison case, and what in our view appears to be a gradually but persistently broadening concept of taxable income as exemplified by the Glenshaw Glass Co. and General Investors Co. cases, supra."

In view of the foregoing, since the precise issue here presented ~~of~~ first impression on the appellate level, and, according to the taxpayer, is a test case affecting a substantial number of cases now pending before the Internal Revenue Service, we are constrained to relate in some detail the factual aspects of this controversy.

The taxpayer cites as critical and dispositive on the score of the issue as to whether the initial payments made by subscribers were "contributions in aid of capital construction", or, as the Government asserts, and the Tax Court found, "part of the payment for services rendered or to be rendered" the following elements:

The communal aspects of the enterprise, and its pioneer, highly expensive and hazardous nature; subscribers' initial payments were intended to be, and were, expended solely for capital construction; the advice given to subscribers on their solicitation that it was the considered and declared intention of the taxpayer's incorporators to finance capital construction through "contributions"; the latter were denominated as "contributions" by the contracts; total "contributions" at all times were less than construction costs; they were segregated on the taxpayer's books and treated in its tax returns as such; the amount of the contributions was reduced from time to time so as not to exceed the costs of construction; subscribers were required by

their contracts to make monthly service payments in order to receive service and profits, if there were any, were only realizable from the monthly service payments; and finally, the capital facilities had no salvage value.

The Government cites these factual elements:

The initial payments were made pursuant to a contract under which taxpayer legally obligated itself to perform services in exchange; only those persons who made the initial payments were eligible to receive service upon further payment of monthly service charges; the payments in question were not made for the benefit of the public or the community at large, but for the sole and exclusive benefit of the customers making the payment —that benefit consisting of agreed services to be rendered by the taxpayer; the customer could not sell, assign, or transfer his eligibility to service; although a customer who made the initial payment remained eligible to receive service even though he moved to a different part of the community, the person who moved into his old home was required to make an initial payment of his own in order to become eligible to receive the taxpayer's service; and, commercial establishments were required to make a higher initial payment than residential customers solely because it was thought they could pay the higher amount.

■ In considering the issue presented here we are guided by these well-settled principles: "Taxation is an intensely practical matter, and, it deals with realities not semblances; with substance and not form * * *",[4] and, "It must ever be kept in mind 'that the substance of the transactions will prevail over form'".[5]

■ Upon consideration of the record and the contentions of the parties as to the ultimate finding of fact to be made from the undisputed basic facts we are of the opinion that the Tax Court's ultimate finding that the initial payments made by the taxpayer's customers " * * were not gifts or contributions to capital", but " * * * were part of the payment for services rendered or to be rendered" by the taxpayer, was amply sustained by the record and that the Tax Court correctly ruled the initial payments to be includable in the taxpayer's gross income under Section 22(a) of the Internal Revenue Code of 1939.

Detroit Edison Co. v. Commissioner, supra, is an illuminating guide to our determination, although it is true, as the taxpayer urges, that the Supreme Court did not, nor was it required to, there decide the precise issue here presented.

In Detroit Edison the taxpayer claimed depreciation on certain extensions of its lines paid for by prospective customers as a prerequisite to obtaining service and treated by the taxpayer as contributions to capital. The payments made by the customers never exceeded and sometimes fell short of the actual cost of the facilities. They were not included in taxpayer's gross income in its tax returns.

In holding that the Detroit Edison Company did not acquire a substituted basis for depreciation by virtue of its receipt of estimated construction costs from applicants for its services the Supreme Court said (319 U.S. at pages 102, 103, 63 S.Ct. at page 904):

"The Company, however, seeks to avoid this result by the contention that what it has obtained are gifts to it or contributions to its capital of the property paid for by the customer, and that therefore by the provisions of § 113(a) (2) and (8) (B) it takes the basis of the donor or transferor. *It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transactions neither in form nor in substance bore such a semblance.*

4  Thompson v. Commissioner, 3 Cir., 1953, 205 F.2d 73, 78.

5.  Urquhart v. Commissioner, 3 Cir., 1954, 215 F.2d 17, 19.

> *"The payments were to the customer the price of the service * * * "*. (emphasis supplied)

We are unable to discern any substantial factual distinction between the initial payments made by the taxpayer's customers in the instant case and the payments made by the customers in Detroit Edison. In each case the payments were made as a prerequisite to obtaining direct personal service via the construction of facilities which would provide such service; in each instance the payments were not for a community or public benefit, as in Brown Shoe Co. v. Commissioner, 1950, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081, and in Commissioner v. McKay Products Corp., 3 Cir., 1949, 178 F.2d 639, 641, where the payments were made to the taxpayer by a community group to promote communal interests, and were for that reason held to be "contributions to capital" meriting depreciation allowance under applicable revenue laws.

In both the Brown Shoe and the McKay Products cases it was stressed that the payments were not made by "customers" nor as "payments for service" to them.

In Brown Shoe the Supreme Court emphasized these factors, stating (339 U.S. at page 591, 70 S.Ct. at page 824):

> "Because 'in the Detroit Edison case 'The payments were to the customer the price of the service,' the Court concluded that 'it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company.' Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions between petitioner and the community groups. The contributions to petitioner were provided by citizens of the respective communities *who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions*

might prove advantageous to the community at large. Under these circumstances the transfers manifested a definite purpose to enlarge the working capital of the company." (emphasis supplied)

In McKay Products, Judge Goodrich, speaking for this Court said (178 F.2d at page 643):

> "We think that what is significant is that the Detroit Edison Co. *was in the business of selling electric power to the very persons whose payments it sought to depreciate,* and that it was Detroit Edison's policy to deliver power to outlying areas *only* if the consumer bore the cost of the line extension. The matter is really summed up in the Court's statement that *payments were the price of the service."* (emphasis supplied)

Our determination that the initial payments in the instant case were "the price of the service" received by taxpayer's customers is buttressed by these additional factors, absent in Detroit Edison: (1) while a customer who made the initial payment remained eligible to receive taxpayer's service even though he moved to a different part of the community the person who moved into his old home was required to make an initial payment of his own in order to become eligible to receive service; (2) the contract between the taxpayer and its customers provided for "forfeiture" of the latter's initial payments in the event of any default on their part and for a "refund" of such payments, according to a fixed schedule, in the event the "taxpayer terminated the contract for its convenience" and (3) commercial establishments were required to make a higher initial payment than residential customers solely because it was deemed by the taxpayer that they could afford the higher amount.

The requirement that one who moved into a customer's old home must make an initial payment of his own in order to receive service scarcely squares with the taxpayer's contention that all initial payments by subscribers were "in aid of capital construction" and the contractual

provisions for "refunds" of initial payments on certain contingencies are certainly at odds with the taxpayer's concept of such payments as "contributions".

The variation in the scale of initial payments required of individual and commercial customers based on the "ability to pay" concept certainly lends itself more to a "price for service" finding than a "contribution" theory.

Analysis of the substance rather than the semblance of the relationship existing between the taxpayer and its customers in the light of the principle that "taxation is an intensely practical matter" inescapably discloses that the relationship was that of seller-customer.

The communal aspects of the enterprise, urged by the taxpayer, are entirely lacking in significance. The initial payment made by a customer was the admission price which he paid for his individual enjoyment of the taxpayer's facilities and in no sense could it be regarded as a contribution to community participation. Only he who bought a ticket could "go for the ride". The pioneer and hazardous nature of the enterprise and the circumstance that the capital facilities had no salvage value, heavily stressed by the taxpayer, are of no critical value with respect to the issue here involved.

The taxpayer's reliance on Edwards v. Cuba Railroad Co., supra, is, to state it bluntly, misplaced. The facts in that case are clearly distinguishable. There as the Supreme Court stated (268 U.S. at page 633, 45 S.Ct. at page 615) "The subsidy payments taxed were not made for services rendered or to be rendered." Furthermore, as observed by Chief Judge Biggs, speaking for this Court in Commissioner v. Glenshaw Glass Co., 3 Cir., 1954, 211 F.2d 928, 931,[6] the Supreme Court in Detroit Edison " * * * indicated some halt in the doctrine of capital

donation expressed in Edwards v. Cuba R. Co."

As to Liberty Light & Power Co., 1926, 4 B.T.A. 155, Great Northern Railway Co., 1927, 8 B.T.A. 225 affirmed 8 Cir., 1930, 40 F.2d 372, certiorari denied Great Northern R. Co. v. Burnet, 282 U.S. 855, 51 S.Ct. 31, 75 L.Ed. 757 and cases which followed the rule they enunciated, we can only say we are not in accord. We agree with the Tax Court that these cases cannot be distinguished factually.

The Supreme Court, in Commissioner v. Glenshaw Glass Co., 1955, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483, General American Investors Co. v. Commissioner, 1955, 348 U.S. 434, 75 S.Ct. 478, 99 L.Ed. 504, Commissioner v. LoBue, 1956, 351 U.S. 243, at page 246, 76 S.Ct. 800, at page 803, 100 L.Ed. 1142, has, as it stated in the latter case " * * * repeatedly held that in defining 'gross income' as broadly as it did in § 22(a) Congress intended to 'tax all gains except those specifically exempted' ". In Robertson v. United States, 1952, 343 U.S. 711, 714, 72 S.Ct. 994, 996, 96 L.Ed. 1237, it was specifically held that "Where the payment is in return for services rendered, * * * " such payment is gross income under § 22(a).

There remains but this to be said. Taxpayer urges that Congress has now specifically recognized, by the enactment of Section 118(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 118(a), that gross income does not include any contribution to the capital of a company. Our agreement with the Tax Court's ultimate finding that the initial payments here were "part of the payment for services rendered or to be rendered" and not as capital contributions makes unnecessary any discussion of that contention. However, we must point out that the Committee Reports [7] accompanying Sections 118 and 362 [8] of the 1954 Code

6. Reversed on other grounds, Commissioner v. Glenshaw Glass Co., 1955, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483, rehearing denied 349 U.S. 925, 75 S.Ct. 657, 99 L. Ed. 1256.

7. H.R. No. 1337, 83d Cong., 2d Sess. 17 (1954); Sen.Rep. No. 1662, 83d Cong., 2d Sess. 18 (1954).

8. Sen.Rep. No. 1662, 83d Cong., 2d Sess. 271–272 (1954).

(also cited by taxpayer) make it clear these provisions are not applicable to contributions or other payments by persons who are direct beneficiaries of the service rendered by the recipient corporation.

For the reasons stated the decision of the Tax Court will be affirmed.[9]

---

**9.** It merits observation that in his excellent Note—Contributions to Capital by Non-shareholders, 3 Tax L.Rev. 568, 573 (1948), Joseph O'Meara, Jr., then lecturer on Federal Taxation, University of Cincinnati, College of Law, concluded with this statement:

"*Detroit Edison* accordingly appears to foreshadow a contraction of the area in which *Cuba Railroad* will be followed in the future; it suggests that a payment will not be considered a contribution to capital if exacted from a prospective customer as a prerequisite to doing business with him."