**COMMUNITY T. V. ASSOCIATION OF HAVRE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 2156.

United States District Court
D. Montana,
Havre-Glasgow Division.

Feb. 28, 1962.

J. Chan Ettien, Havre, Mont., and Hugh D. Galusha, Jr., Peter Meloy and Robert C. Johnson, Helena, Mont., for plaintiff.

Burton A. Schwalb, Washington, D. C., Moody Brickett, U. S. Atty., Butte, Mont., and Clifford E. Schleusner, Asst. U. S. Atty., Billings, Mont., for defendant.

JAMESON, District Judge.

This is a suit for refund of income taxes paid by plaintiff corporation, Community T. V. Association of Havre. The sole issue is whether payments received by the plaintiff in 1955 ($34,737.88) and 1956 ($10,298.03) from "Class B" stockholders in return for the issuance of "Class B" stock, constituted ordinary tax-

able income under Section 61(a) [1] of the Internal Revenue Code of 1954 or nontaxable payments of capital under either section 118(a) [2] or section 1032(a) [3] of the 1954 Code. Most of the facts were stipulated, and essentially there is no factual dispute.

Plaintiff is a Montana corporation organized for the purpose of providing television signals to the residents of Havre, Montana, through a television cable system. The articles of incorporation authorized the issuance of 1000 shares of "common stock" of the par value of $100 each, of which 500 shares were "designated" as Class A stock, and 500 shares as Class B stock.

In order to receive television signals from the plaintiff, a customer was required to execute a "Connection and Service Agreement". Under this agreement each subscriber was required to pay a connection and service charge; and in addition he was required to pay $100 in cash, for which he would receive a certificate for one share of "Class B stock". The price of the stock could be paid either in one lump sum or in installments. The subscriber had the option, however, to get the service for a period of six months on a rental plan through payment of a prescribed rental charge. At the end of the six month period he could purchase one share of Class B stock for $100 and receive credit upon the purchase price of the difference between the six month rental charge and the lower regular monthly service charge he would have paid as "a Class B stockholder".

A failure by the subscriber to pay any of the rates and charges or any other violation of the agreement would give plaintiff the right to terminate the agreement and discontinue the service. In such case the subscriber would have no claim against the plaintiff and would, presumably, forfeit all moneys paid in. Either the subscriber or the plaintiff could terminate the agreement on 30 days' written notice. This right was a subscriber's exclusive remedy if dissatisfied with the service, and upon termination by the subscriber the plaintiff had no other or further liability to him. A subscriber could not assign, sublet or transfer his rights under the agreement without the prior written consent of the plaintiff.

Under the articles of incorporation Class A stock has sole voting and dividend privileges, and prior rights on liquidation. Class B stock enjoys none of these privileges and is subject to redemption at any time.[4] The limitations of the Class B

1. Section 61(a) provides in part: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
   "(1) Compensation for services, including fees, commissions, and similar items;
   "(2) Gross income derived from business; * * *." (26 U.S.C.A. § 61(a).)

2. Section 118(a) provides: "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." (26 U.S.C.A. § 118 (a).)

3. Section 1032(a) provides: "No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation." (26 U.S.C.A. § 1032(a).)

4. The articles and by-laws recite:
   "The Class B stock shall be distinguished from Class A stock as follows:

   "(a) Class B stock shall have no voting privileges, all of the voting privileges being vested in Class A stock;

   "(b) Class B stock shall not be entitled to participate in the profits of the corporation nor to receive any dividends;

   "(c) On liquidation of the corporation, the Class B stock shall not be entitled to participate in the assets of the corporation until the holders of all Class A stock shall have first received the par value of their stock; and when the par value of all issued and outstanding Class A stock shall have been fully paid to the holders thereof, the Class A stock and the Class B stock shall participate equally in the balance of the property and assets of the corporation;

   "(d) The Board of Directors shall have the right to redeem all or any part of the Class B stock at any time for the par value thereof; and

   "(e) Class B stock shall be subject to such other conditions, restrictions and

stock set forth in the stock certificate read: "This Class B stock does not entitle the owner thereof to vote nor participate in the profits of the corporation nor receive any dividends nor to share in the assets of the corporation on liquidation until after all Class A Stock is paid in full. This stock is subject to redemption at par at any time, and is subject to such other restrictions and limitations as the Board of Directors shall, by majority vote, from time to time prescribe."

Either the Class A stockholders or board of directors may amend the by-laws. At all times material to this controversy, 190 shares of Class A stock had been issued, thereby creating a capital account of $19,000 attributable to Class A stock. Some 440 shares of Class B stock had been issued.

Certificates for Class B stock were delivered to the subscribers in most cases. In some instances, however, the corporation held undelivered certificates because the owners had not called for them or to sign receipts for them.

The proceeds from the sale of Class B stock were segregated and carried on the books of the corporation as investment capital. However, the annual reports of the corporation to the State of Montana, filed from 1955 to 1961, do not include the Class B stock as part of the capital of the corporation. Plaintiff's accountant testified that the omissions were mistakes or oversights, but admitted that the purpose of such reports is to inform the public of the ownership and capital of the corporation.

One share of Class B stock was redeemed at par by the corporation and held on its books as treasury stock. The books of the corporation also show five transfers of Class B stock certificates. New certificates were issued to each of the transferees.

Under the by-laws the president or a majority of the board of directors may call a meeting of the holders of Class B stock, but any action taken by the Class B stockholders "shall be for advisory purposes only and shall not be binding upon the officers, directors, property or affairs of the corporation". The Class B stockholders were called together for one meeting in November, 1956, for the purpose of getting their approval of a resolution to drop the requirement that a new subscriber purchase one share of the Class B stock. Approval was given (although not necessary to corporate action under the articles of incorporation and by-laws) and thereafter sales of Class B stock were discontinued. Those who were buying Class B stock in installments and had not yet paid the full purchase price, were reimbursed by credits toward future service charges. Those subscribers who had paid the full price of $100 retained their stock.

The president of the corporation estimated the current value of the corporate assets at $250,000. The company's accountant testified that the liabilities as of December 31, 1960, were about $38,000 and would be less on December 31, 1961.

Under these facts, did the receipts from "Class B stock" constitute (1) a contribution to capital under section 118(a) (footnote 2); or (2) money received in exchange for stock within the meaning of section 1032(a) (footnote 3)?

▪▪ It seems clear that the receipts from Class B stock are not "contributions to capital" exempted by section 118(a). Payments made to a corporation in consideration of services rendered or to be rendered or in consideration of direct benefits to be received from the corporation constitute taxable income. See Teleservice Co. of Wyoming Valley v. Commissioner of Internal Revenue, 3 Cir. 1958, 254 F.2d 105, cert. denied 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364; United Grocers, Ltd. v. United States, N.D. Calif.1960, 186 F.Supp. 724; Warren Television Corp. v. Commissioner, 1958, 17 T.C.M. 1053.[5]

---

limitations as the Board of Directors shall, by majority vote, from time to time prescribe."

5. Compare Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286; Texas & Pacific Ry. Co.

Insofar as section 118(a) is concerned, this case is not distinguishable from Teleservice Co. of Wyoming Valley v. Commissioner of Internal Revenue, supra. Teleservice Company operated a community television service supplying a signal to persons in poor reception areas. To finance the construction necessary to build the system, contributions were solicited from subscribers. They were advised that the contributions were in aid of construction and had no bearing on the television service which would be charged monthly as an extra item. As in the instant case, a contributor could not sell, assign, or transfer his eligibility to receive signals. Under their contracts, the subscribers were not entitled to a refund of any part of their contribution save a partial payment in one instance— if the taxpayer terminated the service for its own convenience. The court held that the contributions were not within the provisions of section 118(a) and section 362 [6] of the 1954 Code, since in substance they were payments for a service and were not made solely to benefit the general community without expectation of services or direct benefits as is contemplated by those sections.[7] Cf., Brown Shoe Co. v. Commissioner, supra.

Warren Television Corp. v. Commissioner of Internal Revenue, supra, was a similar case. In Warren the taxpayer was again a corporation engaged in a community television business substantially the same as that conducted by the Havre Community T. V. Association. Being unable to finance the original installation, the taxpayer's officers and employees solicited "capital contributions" from those desiring to "hook on" to taxpayer's television cable service. Residential subscribers paid $125 and commercial establishments $150. In return subscribers received "Capital Contribution Certificates". Only contributors were allowed to connect to the cable. During each of the years material to that case, the taxpayer repurchased some of the certificates, seven the first year at an average price of $65.70; 26 the second year at an average price of $97.00; and 66 the third year at an average price of $99.53. Again the initial contribution did not alone entitle a subscriber to the service; a monthly maintenance and rental fee was charged. The Tax Court found the Warren case "indistinguishable in principle" from Teleservice Co. of Wyoming Valley v. Commissioner of Internal Revenue, and held that the "contributions" were not exempt from income as contributions to capital under sections 118(a) and 362.

The chief factual difference between the instant case and Warren Television Corp. v. Commissioner of Internal Revenue, is pointed up by the language of the Tax Court:

"A holder of a 'Capital Contribution Certificate' issued by petitioner had none of the rights and privileges accorded under the laws of the State of Delaware to holders of shares of capital stock of a corporation incorporated under the laws of such State. Thus, no holders of a 'Capital Contribution Certificate' had any voting rights, any right to receive dividends payable to shareholders of petitioner *or any right to receive any distribution in liquidation of the corporation* which would be payable to

v. United States, 1932, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108; Continental Tie & Lumber Co. v. United States, 1932, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111; with Brown Shoe Co. v. Commissioner, 1950, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081; and Edwards v. Cuba Railroad Co., 1925, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124.

6. Section 362 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 362, deals with the basis of property acquired by a corporation as a contribution to capital.

7. While no stock was issued in Teleservice Co. of Wyoming Valley, insofar as section 118(a) is concerned the same rule is applicable with respect to payments by shareholders of a corporation, and it must be determined in each case whether the payment was in fact a capital contribution or a payment for service. See United Grocers, Ltd. v. United States, supra, and cases there cited.

holders of petitioner's capital stock." (Emphasis supplied.)

This brings us to the second and more difficult question, i. e. whether payments for subscriptions to "Class B stock" constitute money received "in exchange for stock" of the corporation. Plaintiff, while not agreeing with the conclusions of Teleservice Co. of Wyoming Valley and other cases discussed infra, in effect concedes that it may not claim exemption under section 118(a). It contends, however, that section 1032(a) is applicable and determinative of the issue here.

The laws of Montana authorize the creation of "two (2) or more kinds of stock of such classes, with such designation, and with such voting powers, if any, with any desired limitations and restrictions thereof, as shall be stated in the original or amended articles of incorporation * * *." [8]

In the instant case the corporation authorized the issuance of two classes of "common stock", designated Class A and Class B. The Class B stock does not possess any of the ordinary attributes of common stock, i. e., the right to pro rata dividends, participation in the profits and management, and equal sharing in the ultimate distribution of assets.[9] It is not unusual for a corporation to authorize nonvoting common stock; but in addition, the Class B stock here does not at any time participate in any dividends, has no voice in management (except upon request in an advisory capacity), and would participate in the distribution of assets only after the Class A stock is paid in full. Moreover, the Class B stock is subject to redemption at par at any time and to any other restrictions and limitations the board of directors (selected from the Class A stockholders) may by majority vote prescribe. There is no limitation upon the dividends which the Class A stockholders and directors may vote for themselves. In the event of default under the "Connection and Service Agreement", the interest of the Class B stockholder is subject to forfeiture without reimbursement.

It is obvious that no one except a subscriber to the television service would be interested in acquiring any "Class B stock"; and a subscriber, only because he was required to purchase a share of stock in order to obtain television service (except for the six month rental period set forth above). The issuance of Class B stock was an integral part of the "Connection and Service Agreement". As a practical matter, the most a subscriber could hope to realize on the stock would be a possible return of his initial investment, without any dividend or profit.[10]

Neither party has cited any case, nor have I found any, construing section 1032 (a) with respect to "stock" of the nature of the Class B stock here involved.[11] Section 1032(a) had no counterpart in the Internal Revenue Code of 1939; and neither the legislative history of section 1032(a) nor rulings and regulations un-

8. Section 15–801(8), R.C.M.1947.

9. See 18 C.J.S. Corporations § 216, p. 648; Elko Lamoille Power Co. v. Commissioner of Internal Revenue, 9 Cir. 1931, 50 F. 2d 595, 596; Commissioner of Internal Revenue v. H. P. Hood & Sons, 1 Cir. 1944, 141 F.2d 467.

10. There would be a possibility of realizing an additional amount upon liquidation after Class A stockholders had been paid in full, but in view of the fact that the Class B stock could be redeemed at par and there is no restriction on payment of dividends to Class A stockholders, this possibility is remote and illusory.

11. The purpose of section 1032 was to remove uncertainty and confusion in a considerable body of case law with respect to the tax effects to a corporation resulting from the disposition of its treasury stock or the cancellation of stock it purchased and issuance of new stock, with differing rules depending upon such factors as whether the corporation was in fact "trading and dealing" in its own stock. See discussion in Mertens, Law of Federal Income Taxation, Code Commentary Volume, § 1032:1; and H.R. Rep. No. 1337, 83d Cong., 2d Sess.; S. Rep. No. 1622, Ibid; Legislative history reported pp. 4410 and 5069, U.S.Code Cong. and Admin.News (1954).

der this section assist in determining the question here presented.[12]

Except for the issuance of stock certificates, the case cannot be distinguished from Warren Television Corp. v. Commissioner, supra. While denominated a class of common stock, the only proprietary interest of the Class B stockholders was a distributive share of the capital assets upon liquidation, after Class A stockholders had been paid in full.

We cannot overlook the oft pronounced rules "that the incidence of taxation depends upon the substance, not the form, of the transaction",[13] and that the essence of any arrangements must be "determined not by subtleties of draftsmanship but by their total effect".[14] "It is an axiom of tax law that the form of a transaction may not govern its tax consequences where the substance of what was accomplished demands another result".[15]

As a matter of substance, it is obvious that the subscribers did not acquire their Class B stock as an investment and did not pay their money for the purpose of acquiring a proprietary or equity interest in the corporation, but solely to enable them to receive the television signal service of the taxpayer corporation. When the requirement that a subscriber purchase a Class B certificate, in order to receive television service, was dropped early in 1956, the form was discontinued as to those subscribers who had paid only part of the $100 required for a share of stock.[16] The money paid in was credited against the regular monthly service charges and the substance of the transactions was thereby revealed.

Following the discontinuance of the Class B stock requirement and the meeting of November 16, 1956, the minutes of the meetings held by the Class A stockholders show a willingness and an intention to bestow some benefit upon the Class B stockholders. Just what that benefit would be was left undecided as late as 1958, but the minutes indicate that it probably would take the form of free service—further indication that service was the real debt owed Class B stockholders and the only consideration given for the $100 amount they had paid

12. In an entirely different context, i. e. with respect to recognition of gain or loss in the exchange of stock as provided by section 112(b) (2), Internal Revenue Code of 1939, 26 U.S.C.A. § 112(b) (2), a revenue ruling in 1954, in discussing the attributes of common and preferred stock, reads in part:

"The special stock in the instant case, both before and after the recapitalization is not *common stock since the holders thereof do not share ratably either in the earnings of the corporation or in its assets on liqudation,* it being specifically provided that the holders of shares of any designated series have no interest in the assets or income of any other series. * * * Neither is the special stock a *preferred stock since the holders thereof are not preferred as to dividends out of the entire earnings of the corporation* and are restricted to the earnings of the segregated assets representing his particular class of special stock. Likewise the holder of special stock has no *preference in the general assets of the corporation on liquidation,* excepting the right to share ratably with other members of his class in the segregated assets representing that par-

ticular class of special stock. * * * " (Emphasis supplied.) Rev.Rul. 54–65, CB 1954–1, page 101.

13. Commissioner of Internal Revenue v. Hansen, 1959, 360 U.S. 446, 461, 79 S.Ct. 1270, 1279, 3 L.Ed.2d 1360, and cases there cited.

14. Commissioner of Internal Revenue v. P. G. Lake, Inc., 1958, 356 U.S. 260, 266, 78 S.Ct. 691, 695, 2 L.Ed.2d 743, rehearing denied 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071.

15. Anderson v. United States, 9 Cir. 1956, 232 F.2d 794, 800.

16. At the annual meeting of the stockholders held on March 22, 1958, the president reported that "effective February 17, 1956, the association no longer required the purchase of the $100 share of Class B stock as a condition to the purchase of a cable T. V. hookup". At the request of the president there was also entered as a matter of record, the minutes of the meeting of the Class B stockholders held November 16, 1956, the president stating that these minutes had been overlooked in the minutes of the 1957 annual meeting.

**276**

in. These minutes point up again the obvious fact that Class B stockholders would get nothing that the Class A stockholders did not want to give them.

The continued omission of the Class B stock receipts from the capitalization section of the Corporation's Annual Reports to the State of Montana, even after this litigation was commenced,[17] cannot be reconciled with plaintiff's theory that the Class B certificates are capital stock certificates evidencing a proprietary interest in the corporation. It seems clear that plaintiff's officers and directors treated and intended the Class B certificates as stock solely for tax purposes. Just as in the Warren and Teleservice cases, the subscriptions or contributions or whatever they may be termed are in substance and in law payments for television services to be rendered and constitute ordinary taxable income to the plaintiff.[18]

It is my conclusion that while certificates of stock were issued to the Class B stockholders, the payments of money made to the taxpayer corporation upon the issuance of the certificates were not made for stock, but rather for services rendered and to be rendered by the corporation; and that the purported stock purchases were in fact payments required of subscribers in consideration of such services. The payments accordingly constituted ordinary taxable income under Section 61(a) of the Internal Revenue Code of 1954. (See footnote 1.)

The defendant will prepare, serve, and lodge findings of fact, conclusions of law, and draft of judgment pursuant to Rule 11 of the Local Rules of Court.

17. For each of the years 1955 to 1960, inclusive, the report contained the following:
   "1. Amount of authorized capital stock is ........$100,000
   2. The proportion of the authorized stock actually paid in is ........ 19,000"

18. See also Overton v. Commissioner of Internal Revenue, 1946, 6 T.C. 304, affirmed 2 Cir. 1947, 162 F.2d 155, where corporate dividends were held taxable income to Class A stockholders even though they were paid on a Class B stock held by

the wives of the Class A stockholders. The Class B stock had a liquidation value of $1.00 per share, no management power, and limited voting rights, but dividends were payable after payment of dividends on Class A stock and in fact exceeded the dividends paid on Class A stock. The court stated that its conclusion that the arrangement, though made in the form of a gift of stock, was in reality an assignment of part of the taxpayer's future dividends, was inescapable "unless form is to be exalted above substance".