**BATTELSTEIN INVESTMENT COM-PANY, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 27993.**

United States Court of Appeals, Fifth Circuit.

Feb. 19, 1971.

Robert I. White, Robert L. Waters, Houston, Tex., for plaintiff-appellant; Chamberlain & Hrdlicka, Houston, Tex., of counsel.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., Howard A. Weinberger, Tax. Div., Dept. of Justice, Fort Worth, Tex., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Michael B. Arkin, Edward L. Rogers, Meyer Rothwacks, Robert I. Waxman, Attys., Tax. Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and RIVES and GEWIN, Circuit Judges.

JOHN R. BROWN, Chief Judge.

This is an appeal by Taxpayer (Battelstein Investment Company) from an adverse tax refund judgment the effect of which is to sustain the Government's contention that there was an unreasonable accumulation of earnings setting in train the accumulated earnings tax under 26 U.S.C.A. §§ 531, 532 for FY 1962 and FY 1963 (ending January 31). We affirm.

The facts, most of which are undisputed, are set out in the detailed opinion of the District Court upon which we draw freely without reiteration here. Battelstein Investment Co. v. United States, S.D.Tex., 1969, 302 F.Supp. 320. This opinion likewise canvasses fully the legal principles and their application to the several categories of corporate "needs" urged by Taxpayer as justification for accumulation of 100% of the earnings for each of these two years. Indeed, save for the unique contention of Taxpayer which the District Judge impliedly rejected but did not specifically mention and which we have difficulty in understanding, there are no really distinctive questions of law as such. All is essentially one of fact, so that for taxes as well as death the Judge's fact findings come here with the Buckler and Shield of F.R.Civ.P. 52(a). Helvering v. National Grocery Co., 1938, 304 U.S. 282, 292–294, 58 S.Ct. 932, 82 L.Ed. 1346; Carlen Realty Co. v. Tomlinson, 5 Cir., 1965, 345 F.2d 998.

We do have some pause about FY 1962 largely because of the plans to renew fixtures in the River Oaks store (the fixtures being leased by Taxpayer to the operating retail affiliate) within the succeeding four years or so. But with working capital of $137,558 at the end of FY 1962, a substantial amount of highly liquid assets including accrued rent from the affiliate, and the then effective amortization schedule of $50,000 per year on the existing long term debt, the Judge was entitled to conclude that Taxpayer had failed to demonstrate that retention of 100% of that year's earn-

ings was needed that year to accomplish the replacements.

No such doubts concern us for FY 1963. For while added liabilities were taken on in the form of long term debt for the purchase of the Crosstimbers Shopping Center—an acquisition we are quite willing to assume was an expansion in the business purposes of the corporation and not a mere investment in unrelated properties to possibly imperil the Judge's finding that Taxpayer was not an investment or holding company —Taxpayer's situation had markedly changed by the sale of its South Main land at a sixfold profit. First,. the gain to be taxed that year under the installment sale was primarily responsible for an increase in working capital to $358,630. Next, and more important, the amount due under the long term installment note in subsequent years was $571,875, the net gain of which would be at least $474,448.

■ Looking ahead—as the concept of reasonable accumulating contemplates —Taxpayer, as it surveyed the future at FY 1963's end, could not ignore this rich resource. This bluechip note effectually secured by gilt-edged Houston land was then worth not less than the discounted value. Granted that for income tax purposes the deferred payments did not constitute "income" or "earnings" for FY 1963 the discounted value of this highly liquid asset had to be reckoned with in weighing foreseeable, planned (i) needs against (ii) available resources at the time of need.

With this resource in hand and crediting fully the good faith sincerity of Taxpayer's distinguished management that down the line the operating company would open up new Houston suburban stores in which Taxpayer would render significant fiscal services, the uncertainty as outlined by the Trial Judge in time, expense, kind and amount was quite enough for him to conclude that Taxpayer had failed to establish a need for an additional $47,115 by retention of 100% of the operational earnings of FY 1963.

As the insulation of F.R.Civ.P. 52(a) is thin or nonexistent when fact-findings are the product of an erroneous view of controlling law,[1] we must in our proper role assay the only distinctive issue of whether, as claimed by Taxpayer, the Trial Court committed a basic error of law.

■■ One difficulty we have is that of understanding. But divining it as best we can, we think the Taxpayer means to suggest that we ought to approve the theory that seems to run somewhat as follows. The first step of the theory begins with the accepted "brick and mortar" generality characterized by Electric Regulator Corp. v. Commissioner of Internal Revenue, 2 Cir., 1964, 336 F.2d 339, 344 as the "governing principle—cogently" stated in Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 4 Cir., 1960, 274 F.2d 495, 501, cert. denied, 1960, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011. "To the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity * * *" because the "accumulated earnings which have been converted into brick, mortar, machinery, equipment and inventory were scarcely available for current expenses or expansion." 336 F.2d 339, 344. The second step is that the theory of deduction for depreciation is to afford resources from which a business can replace equipment or plant as it becomes obsolescent or exhausted.[2]

1. Fulton National Bank v. Tate, 5 Cir., 1966, 363 F.2d 562; Continental Motors Corp. v. Continental Aviation Corp., 5 Cir., 1967, 375 F.2d 857; Davis v. Park-hill-Goodloe Co., Inc., 5 Cir., 1962, 302 F.2d 489.

2. Taxpayer presses United States v. Ludey, 1927, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054; Detroit Edison Co. v. Commissioner of Internal Revenue, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286; Treasury Regulations § 1.167(a)–1(a); and Massey Motors, Inc. v. United States,

■■ The third and concluding step seems to be the rather innocuous one that (i) with all plowed back into "brick and mortar" (ii) resources for plant replacement may be obtained through additional retentions. But it is not the innocuous notion that with respect to the certain need for replacement at a fixed date, a business may hold back earnings for that event which is really not contingent. Rather, on the tax-structure theory of depreciation the deduction assumes that at some time *all* plant and equipment will need replacing even though in practical experience the business world knows that plants often last way beyond the formula's "four score and ten" life. Taxpayer's contention means—whether Taxpayer says so or not—that a business is entitled to retain in quick-cash form earnings up to the total of the depreciation reserves.[3]

■ Perhaps to make it more palatable, Taxpayer puts forward a beguiling structure by which "accumulated earnings" are in fact completely exhausted since, on a cash-flow analysis the "brick and mortar" assets must be deemed to have been "paid" for, first, out of earnings, and, second, only out of depreciation reserves to the extent accumulated earnings are insufficient. If, in this process of investment with the *Smoot* "impunity" all earnings have been spent then obviously there can be no cumulative earnings still available.[4]

1960, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 which stated: "First, it may be well to orient ourselves. The Commissioner admits that the automobiles involved here are, for tax purposes, depreciable assets rather than ordinary stock in trade. Such assets, employed from day to day in business, generally decrease in utility and value as they are used. It was the design of the Congress to permit the taxpayer to recover, tax free the total cost to him of such capital assets; hence it recognized that this decrease in value—depreciation—was a legitimate tax deduction as business expense." 364 U.S. at 96, 80 S.Ct. at 1414, 4 L.Ed. at 1595–1596.

3. Taxpayer recoils at the thought: "The Government has argued that Taxpayer is not entitled to accumulate earnings and profits equal to depreciation reserves. Several pages are devoted to this point. Taxpayer has never made such an argument. Such an argument is senseless from a financial point of view. It is a *non sequitur*." Reply brief page 7.

But at least to us Taxpayer soon embraces the notion: "There can be no such thing as 'excessive working capital' (and, therefore, unreasonable additions thereto by accumulated earnings and profits) until the amount of working capital exceeds the amount of the depreciation reserves. *And to the extent* that working capital is less *than the depreciation* reserves, all accumulated earnings *must be* viewed as a matter of law as having been applied to purchase 'brick and mortar' assets or pay debt created to purchase such assets both of which are patently reasonable uses of funds produced by earnings."

(Emphasis added.) Taxpayer's brief page 30.

4. For fear that from lack of understanding we deprecate too much this "depreciation" concept, we draw freely on Taxpayer's brief.

See, e. g., this table (brief 18–19).

At January 31, 1962, Taxpayer's balance sheet reflected the following:

Item ASSETS
| | | |
|---|---|---|
| (1) Working Capital | | $ 137,558 |
| (2) Plant, equipment, land and fixtures ($1,256,657) net of money borrowed to acquire such assets and still owed ($255,000) | | 1,001,657 |
| (3) Total | | $1,139,215 |

SOURCES OF FUNDS TO PURCHASE ASSETS:
| | |
|---|---|
| (4) Stockholders investment in 1929 | $107,500 |
| (5) Reserves for depreciation | 557,629 |
| (6) Accumulation of earnings and profits since Taxpayer's inception | 474,086 |
| Total | $1,139,215 |

This is followed by this argument:
"Even a cursory perusal of these numbers shows that a preliminary inquiry must be made to determine the source of the working capital assets. If the working capital was produced by depreciation reserves, then all of the cash annually produced by earnings and profits must have been used to pay for plant and equipment, a patently reasonable justification for and use of accumulated

Judges and Courts do poorly at best in understanding, articulating and applying today's sophisticated accounting principles, theories and practices. Consequently we disclaim any purpose to assay such ideas as cash being "generated" by depreciation as something distinct from "earnings" either net or gross in terms of operational income. Difficulties of tax law are hardly lessened by such inquiry or by some idea of tracing funds from origin to ultimate investment as though each cent carried its

own "depreciation" or "earnings" identifying isotope.

The appeal is great to find a Delphic solution to the riddle of §§ 531, 532. But this contention is too simple, too unrealistic, too mechanical in its categorical consequences.[5]

█ Of course replacement of plant and equipment may be a factor for retention. See 7 Mehrtens, §§ 39.46, 39.47, p. 98, Law of Federal Income Taxation (1967 Rev.). But allowable depreciation

---

earnings. There will be no dispute that, as of January 31, 1962, the working-capital assets were $137,558 and the net plant and equipment assets were $1,001,657. Which dollars were invested in these two categories of assets?" Of the Trial Court's finding that the working capital (item (1) above) was produced by earnings Taxpayer urges:

"This finding was induced by the court's erroneous view that the controlling law requires that plant and equipment assets be deemed to have been purchased out of funds accumulated through depreciation to the full extent of the depreciation reserve; as we will demonstrate in the next several paragraphs the controlling law is precisely the contrary."

Brief p. 21.

Pointing out that by year end FY 1962 debt retirement on plant (item (2) above) totalled $778,000 Taxpayer was both interlocutor and end man:

"The critical question of law presented to the court below is, which dollars were used to pay the $778,000 of debt, the depreciation dollars of $557,620 or the accumulated earnings dollars of $459,764? With respect to the year January 31, 1962, which dollars paid the $50,000 debt principal, the earnings of $44,927 or the depreciation cash flow of $46,477? Obviously if earnings were used to pay this debt, the earnings have been reasonably used and Taxpayer cannot be penalized under Section 531.

"We submit that as a matter of law the principal of debt incurred to purchase plant and equipment assets must be viewed as having been paid first by the dollars produced by earnings, not depreciation cash flow as the court below assumed."

Brief p. 22.

The same argument is repeated as to FY 1963 in which working capital (item

(1) above) changed to $358,630 plant and equipment (item (2)) to $1,029,670 reserves for depreciation (item (5)) to $609,339 and accumulated earnings (item (6)) to $654,513. Of the finding that working capital of $358,630 was produced by accumulated earnings and profits, Taxpayer urges: this "finding was induced by an erroneous view of the controlling legal principles concerning depreciation reserves and the relationship they bear to earnings accumulations. The taxpayer again submits that, since depreciation reserves at January 31, 1963 exceeded working capital, all working capital as a matter of law should be treated as having been produced from depreciation reserves (not earnings)." Brief p. 31. Taxpayer then adds: "Finally, the trial court failed to take into account that the total depreciation reserves ($609,-339) far exceeded the total working capital as of January 31, 1963, of $358,630, and that *as a matter of law* the working capital in this situation should be treated as having been produced by depreciation reserves and not by accumulated earnings." (Emphasis added.) Brief p. 34.

5. Its most precise form is found in the reply brief: "Our argument is that when accumulated earnings and profits and depreciation reserves both are sources of (1) cash utilized to purchase plant and equipment assets and (2) working capital on hand: (i) in all cases where management expects to perpetuate the company by replacing the depreciable assets when and as they wear out in the future, the working capital on hand must be viewed *as a matter of law* as being produced by the depreciation reserves to the extent of such reserves; and (ii) the plant and equipment assets *as a matter of law* must be regarded as having been purchased first with the dollars produced by earnings and profits." (Emphasis added.)

or depreciation schedules do not alone suffice.[6]

Indeed great care must be used lest replacement cost becomes in effect the subject of a double deduction—first, as a non-cash expense against income, and second, in earnings held back for replacement. See Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 4 Cir., 1960, 274 F.2d 495, cert. denied, 1960, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 in which the Court stated:

> "For the same reasons, the taxpayer's argument concerning the reserves for *depreciation* and *depletion* cannot be accepted. Surplus has already been reduced by annual charges to depreciation expense and to depletion expense; allowing them again would give the taxpayer double deductions. We are cognizant of the fact that replacement of taxpayer's wasting assets will ultimately become necessary, and that for this purpose cash or other liquid assets must be available; but, as will appear, taxpayer had much more liquidity than necessary for such replacement and for all other reasonable business needs." (Emphasis in the original.)

See also Van Hummell, 23 TCM 1765, aff'd., 10 Cir., 1966, 364 F.2d 746, cert. denied, 1967, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102.

The Trial Court was not, therefore, laboring under any supposed basic error of law. The questions—which might well have gone either way, or for that matter both ways, one for FY 1962 another for FY 1963—were essentially a complex of facts. Resolution of the facts was the role of the Trial Judge. F.R.Civ.P. 52(a). There it ends.[7]

Affirmed.

---

6. This was the conclusion reached by the Service in I.R. Ruling 67–64, I.R.B. 1967–9.13:

   "Although the reserve for depreciation itself may be considered and given appropriate weight as a part of the facts and circumstances in considering the reasonable needs of the business, the concept that a non-cash deduction for depreciation based on historic costs requires the setting aside for an indefinite period a cash fund adjusted for economic fluctuations in order to provide for total replacement of plant assets is not within the meaning of the term 'reasonable needs of the business.'

   "Accordingly, a corporation may not include a fund equal to its depreciation reserves escalated for the economic factor of increased replacements costs in justifying the reasonable needs of its business pursuant to section 537 of the Code. However, the reserve for depreciation itself may be considered and given appropriate weight as a part of the facts and circumstances in each case."

   This was cited with approval in Dahlem Foundation, Inc. v. United States, 6 Cir., 1969, 405 F.2d 993, 1002.

7. The Court having found no portion of earnings reasonably retained, there is nothing required under § 535(c) for accumulated earnings credit.