**UNITED STATES of America**

v.

**FAIRCHILD INDUSTRIES, INC. and Edward Uhl.**

Crim. No. M–78–0384.

United States District Court, D. Maryland.

Feb. 7, 1979.

Russell T. Baker, Jr., U. S. Atty., D. Christopher Ohly, and James A. Rothschild, Asst. U. S. Attys., Baltimore, Md., for the Government.

Marvin J. Garbis, Paula M. Junghans, and Stephen C. Struntz, Baltimore, Md., for Fairchild Industries, Inc.

Herbert J. Miller, Jr., William H. Jeffress, Jr., and Seth P. Waxman, Washington, D. C., for Edward Uhl.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The defendants have moved for a judgment of acquittal based upon the opening

statement of the United States Attorney. The motions of the defendants have been supplemented by reference to materials from the Internal Revenue Service which have been produced by the Government pursuant to the court's orders under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ This is a case in which the indictment alleges that the defendants, in violation of 26 U.S.C. § 7206(1), intentionally made U.S. corporate tax returns for the years 1971 and 1972 which were false in that said returns "overstated the cost of the corporation's capital assets" and "overstated the corporation's deduction for depreciation by including therein, respectively, the entire cost of corporation automobiles that were used by certain corporate executives and amounts for the depreciation of those automobiles based thereon when in truth and fact, as the corporation then well knew and believed, the corporation was not entitled to include the entire costs of the automobiles . . . because those corporate executives individually had agreed to pay and paid to the corporation substantial portions of the costs of those automobiles, which payments . . . [were] used and intended to be used for political contributions." In proving the alleged violation of 26 U.S.C. § 7206(1), the Government is required to produce facts demonstrating beyond a reasonable doubt that the treatment of the payments on account of the automobiles, assuming the payments to have been made to Fairchild, was improper under the Internal Revenue Code in the manner alleged in the indictment.

The opening statement of the United States Attorney, in pertinent part, contained the following allegations of facts which the Government expected to prove in this case:

"How were these false? The evidence will show that Fairchild Industries in the period 1965 through 1972 falsely reported, or more accurately, disguised on their corporate tax returns the way in which the corporation was using corporate money to make illegal political contributions.

&ast; &ast; &ast; &ast; &ast; &ast;

" . . . [T]he evidence will show you that Fairchild set it up to look like, on its regular books and records and on its tax returns, to look like the corporation was spending its money to pay for the full cost of corporate automobiles for its executives. But, in fact, the evidence will show you the executives who got those cars reimbursed the corporation for most of the cost of those cars, and those reimbursements to the corporation were used to make political contributions. That's how they got the corporate money out of the corporation.

" . . . Executive officers at Fairchild in the period 1965 through 1972 and general managers of their plants and divisions around the country were told they could have a company car. The company would purchase a car for them which they could use for both business and personal use just as their car. . . . He could go down and pick it out, come back and tell the corporation the car that he wanted, and the company would then send a corporate check to the car dealer for the full purchase price of the car, and the company would buy it. The title would be in the corporation. The corporation would get a certificate of title which would be in its name, Fairchild Industries, and they would keep that certificate of title in the corporate books and records.

" . . . The executives were told when they were offered a corporate car that there was one condition. They would have to pay for a part of the cost of the car. They would have to reimburse the corporation for a substantial portion of the cost of the car, some 63 percent of the cost of the car. . . .

"How were the executives to pay the corporation for their share of the cost of the car? They were to pay by check, but not a check made out to the corporation. They were instructed to make their checks out to cash.

"What happened to those checks made out to cash? The executives did as they were instructed and returned those checks to the corporation's finance department. But the checks were not deposited to Fairchild's regular bank accounts. . . .

" . . . The checks were cashed at the bank by the finance department, turned into currency, and the cash was kept in a cash political fund at the corporation.

"And out of that fund, out of that fund accumulated by the payments that the executives made for part of the cost of the car that they got and the payment went in as cash into this cash political fund—out of that fund came the money that went to the politicians, the politicians which the evidence will show that Mr. Uhl and Mr. Uhl alone decided the corporation should make political contributions to.

"The payment those executives made, the evidence will show you, were not voluntary. The deal was—the deal they were offered, what they were told, what they understood, was you can have a company car if you pay part of the cost of the car. The executives were not offered, did not understand, and in fact did not have a choice. No payments, no car.

\* \* \* \* \* \*

" . . . Some were told, by the way, that this was the way in which they could purchase the car, and you will hear some evidence about that, that this plan that they were offered was a way in which the corporation would help them purchase a car on their own.

\* \* \* \* \* \*

" . . . The evidence will show you that the executives, even those who knew that their payments on the car were going into a cash political fund, that their payments were not voluntary, knowing, free-choice donations, but instead were payments on their car. The evidence will also show you that the reason why Fairchild did not set up a wholly voluntary pooling of donations from its executives for political contributions is that that system wouldn't have produced enough money. The executives wouldn't have been willing, weren't willing to contribute the amounts of money that Mr. Uhl thought were necessary into any such fund. They weren't willing to do it voluntarily.

"Let me turn now to the tax returns. How did Fairchild report the automobiles and the executive car payments and the

cash political fund and the political contributions on its tax returns? Well, the car payments and the cash political fund and the political contributions weren't reported at all. They are not reported at all anywhere on the corporate books and records or on the bank records or on the tax return.

"The automobiles, however, were reported on the tax return. They were reported on the tax return and accounted for on the corporate books and records as if they had really cost Fairchild their full purchase price. No adjustment was made for the part of the cost, the 63 percent of the cost that the executives had reimbursed the corporation that were going into the cash political fund.

"What the indictment charges is that Fairchild wasn't entitled to take depreciation on the basis of the full purchase price of the cars, because they were using the cars to generate political contributions. The cars simply didn't cost the corporation that much, because the executives were paying part of the cost.

"One of the issues that—one of the factual issues that may come up in this case is whether the payments that the executives made for their cars, the reimbursement of part of the cost of the cars, should have been deducted by the corporation on its tax return from the cost of the automobiles that it included on its tax return, and on which it took depreciation, or whether the corporation should have included the payments that it got from the executives as income.

"I just want you to be clear that the corporation, in fact, did neither. It neither reduced on its tax return the cost, the full purchase price of the automobiles to account for the payments that were made by the executives, nor did it include within its income the payments that were made by the executives.

\* \* \* \* \* \*

"The evidence will show you that's [sic] purpose was to disguise the fact that corporate money was being spent on political contributions in Federal elections, disguise

it by saying on the return that the money in fact had been spent on the automobiles.

\* \* \* \* \* \*

"The trouble, the evidence will show you, with that way of raising money for a cash political fund with which to make political contributions was that it didn't raise enough money. Fairchild needed more money for political contributions and so, in 1964 and 1965, Mr. Uhl devised the car payment plan to raise large sums to use for political contributions.

"In working out that formula, you will hear, those two men had two purposes: Their first purpose was to maximize the amount of money that went into the cash political fund; and their second purpose was to make the deal financially attractive enough to the executives so that they would be willing to take the car and made the payments, rather than buying a car on their own.

"You will hear that is the reason why Fairchild did not charge its executives 100 percent, but in fact charged them 63 percent of the cost of the car.

"The purpose in devising that formula was to make it very financially attractive to the executives to go ahead and intervene in this program, have the company car bought, because the executives, the evidence will show, if the deal wasn't sufficiently financially attractive to them, they wouldn't enter into it. They would go out, buy their own cars and there would be no money generated for the cash political fund.

"A formula they arrived at was not that they would pay a hundred percent, but that they would pay 63 percent of the cost of the car, but in order to make it financially attractive to the executives, the executives would not be required to pay all 63 percent up front. They would pay it over time.

"They would pay 20 percent of the cost of the car under the formula that was devised back in 1965, and that has applied straight through this case all the way to the end. They would pay 20 percent of the cost of the car at the time the car was purchased, that the executive made payable to cash, which would be for 18 percent of the purchase price.

"The third year, they would pay a 15 percent and the fourth year they would pay 12 percent.

\* \* \* \* \* \*

"By the way, you will be interested in why the corporate cars were brought back in as a matter of policy, whether the purpose was a legitimate one or whether their purpose was to raise political contributions.

"In the early '60's, in the period of around 1962, a year or so after Mr. Uhl had come to the corporation as President and chief executive officer, corporate automobiles for executives were abolished. They took corporate automobiles away from the executives, wouldn't give them to them anymore, at this time no payments on the cars. For a couple of years corporate executives didn't have company cars because they were too expensive, but the policy of getting corporate automobiles to corporate executives was reinstituted in 1964 and 1965, exactly for the purpose of generating money to go into the cash political fund.

\* \* \* \* \* \*

"You will want to pay attention to the dates in 1972 to see who is saying what, when, and who is doing what, when.

"Most of the direct payments into the fund stopped. That is, people were told to stop sending their checks into cash, cashing the check and putting it in the cash political fund, most, but not all.

"The evidence will show you that the payments weren't really stopped at all and the fund wasn't really stopped at all, despite all the questions raised by Mr. Dealy and all the talk about legality and propriety.

"The fund went right along. Why? Because 1972, as you will remember was a big election year. That was the year of [sic] Nixon was running against McGovern, all the congressional seats were up, a lot of senators were running. It was a big election year.

"The company just couldn't stay out of it and so, even though there were questions at the time at the corporation about the legality, it was decided not to shut the fund

down, not until after the election, the election in the fall of 1972, some six months, at least six months after all those questions first get raised, but they did switch it around a little bit the way they did it.

"Instead of being told to make payments with checks to cash, the corporate executives who owed payments on their cars were told to make political contributions in lieu of their payments.

"Those are the words that were used, 'in lieu of.'

"They weren't just told to go out and make some political contributions either. They were told who to make the contributions to and how much.

"You will see that the amounts that they were told to make their political contributions in were very, very close to the amounts that were due on their car, and they were told that those payments, those political contribution payments that they were making, they were told that those payments were in lieu of their car payments." (1/11/79, Tr. 23 through 65).

The defendants contend that, as described by the United States Attorney in his opening statement, the "scheme," assuming the facts most favorable to the Government, involved payments to the corporation by corporate executives who were allowed by the corporation to use automobiles titled in the corporate name. The payments by the corporate executives were approximately annual in nature and constituted declining percentages of the price of the automobile paid by the corporation, said annual payments totaling at the end of four years approximately 65% of the cost of the automobile to the corporation. The corporation is not in the business of leasing cars, but the cars were to be used partly for corporate business reasons by the executives and partly for their own personal nonbusiness reasons. According to the Government's allegations in the opening statement, the purpose of the "scheme" originated by the corporation was to "generate corporate funds" from which would be made illegal nondeductible corporate political contributions.

The corporation retained title to the automobiles until that time, if ever, when the particular corporate executive involved paid the then fair market value (or, perhaps, the then corporate book value) to the corporation.

The defendants contend that, under the Internal Revenue Code, the tax consequences of the payments to the corporation by the corporate executives were to increase the corporate income in the year in which the payments were made or were agreed to be made. The defendants contend that the said payments could not be treated under the Internal Revenue Code as a reduction in the capital cost of the automobiles.

The Government contends that there are two levels upon which the substantive tax law applicable to this case may be analyzed.[1] First the Government has contended in the course of this prosecution that the "form" of the "scheme" was one in which the payments by the corporate executives were reimbursements of the cost of the corporate cars and that the defendant corporation should have reduced its basis (and the depreciation calculated thereon) of the cars by the amount of the payments it received from the executives. The Government also contends that the "substance" of the "scheme" was one in which the automobiles were not intended to be used in the trade or business of Fairchild, at least to the extent of the expected executive payments amounting to 63% or 65% of the cost of the cars, but were instead acquired as a means to "launder," and obtain an annual depreciation deduction for cash for political contributions, thereby disqualifying the automobiles for a depreciation deduction under 26 U.S.C. § 167(a)(1).

I. *Form*

The court has admittedly had difficulty in following the Government's position. It has appeared that on occasion the Govern-

1. Tr. 1/5/79, pp. 21–22.

ment's arguments have confused the two levels on which it chose to stake out its claim of the proper tax treatment of the "scheme" as it relates to the cost of the "capital assets" and the deduction for depreciation.[2]

Addressing the "form" argument on its merits, however, the court understands the Government's contention to be that the payments by the corporate executives come within the rule of *Detroit Edison v. Commissioner of Internal Revenue,* 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943), and *United States v. Chicago, Burlington & Quincy R. Co.,* 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973). The Government contends that, in form, the payments were not income but reimbursement of costs and ". . . the *only* proper way to account for them was for Fairchild to reduce its depreciable basis in the cars to its 'net investment.'" (Emphasis supplied). (*See* Government's Reply Memorandum of Law to Memoranda filed by Edward G. Uhl and Fairchild Industries (Paper No. 79, page 3)). Under this theory of the Government, it is immaterial to what purpose it was intended by the defendants that the cash payments received from the corporate executives would ultimately be put by the corporation.[3] This court earlier expressed a tentative conclusion that the *Detroit Edison* and *Burlington* cases supported the proposition that a payment in the nature of a reimbursement of the cost of an asset, if not declared as income by a taxpayer, would be required to be reported as a reduction of the asset's cost.[4] The fact that a taxpayer reported such a payment as income would practically preclude a finding that a failure to reduce the cost by the amount of the said payment was *willful* (even assuming that the substantively correct way of reporting the payment was to reduce the cost). But neither *Detroit Edison, supra,* nor *Burlington, supra,* nor any other case of which the court is aware has stated that a payment by a third party, made in connection with the acquisition of an asset by a taxpayer but not

reported as income to the taxpayer, must be reported as a reduction in the capital cost of the asset. In *Detroit Edison* and in *Burlington,* both decided under the 1939 Internal Revenue Code, it was assumed that the payments in question were not income. If those payments there involved had been income, the specific questions then before the Supreme Court of how to treat the payments in the capital account under the 1939 Internal Revenue Code would not have been pending for decision. Those cases cannot in any way be authority for the proposition that a payment which is income, but not reported as income on a tax return, must then be reported as a reduction of the capital cost of an asset in connection with which it is paid.

Under the decisions of the Third Circuit in *Teleservice Company of Wyoming Valley v. Commissioner of Internal Revenue,* 254 F.2d 105 (3rd Cir. 1958), and the United States Tax Court in *State Farm Road Co. v. Commissioner of Internal Revenue,* 65 T.C. 217 (1975), if a payment in reimbursement of the cost of an asset is income, it may not be used to reduce the basis of the asset even though the taxpayer may attempt to elect such treatment by not reporting the payment as income on its income tax returns. This is the conclusion also of the Internal Revenue Service in connection with the "earth station" of Fairchild as demonstrated by certain of the documents ordered to be turned over by the court as *Brady* material. (*See* Paper No. 86).

■ The basis of a capital asset is (to the extent here relevant) its cost (26 U.S.C. § 1012) as adjusted "for expenditures, receipts, losses, or other items, properly chargeable to *capital account* . . . ." (26 U.S.C. § 1016(a)(1)) (Emphasis supplied). If a payment constitutes corporate income, as distinguished from an item properly chargeable to the capital account, it may not be used to adjust the depreciation of a capital asset.

---

**2.** *See, e. g.,* pp. 2–5, Government's Reply Memorandum of Law to Memoranda, etc. (Paper No. 79).

**3.** 1/5/79, Tr. 22.

**4.** 1/10/79, Tr. 3–6.

■ Income is a broad term which, for tax purposes, includes substantially all payments which have not been specifically excluded by statutory or decisional law from the meaning of "income." *See Commissioner of Internal Revenue v. Glenshaw Glass Co.,* 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); 26 U.S.C. §§ 61(a), 101, *et seq.*

■ The court believes that the form of "scheme," as stated by the United States Attorney in his opening statement, was that the payments were made to the corporation in order to obtain the benefit of the use of a company car from the point of view of the corporate executives and from the point of view of the corporation, it was substantially, if not totally, for the purpose of obtaining a cash payment which would not be included on the corporate books and which would be utilized for political contributions. In the court's view, the use to which the corporation intended to put the money does not, at least in form, alter the nature of those payments for tax purposes. Assuming the facts as stated by the United States Attorney, the payments were income to the corporation and could not be used to reduce the basis. *Teleservice of Wyoming Valley v. Commissioner, supra; State Farm Road Corp. v. Commissioner of Internal Revenue, supra.*

■■ While the Government contends in this case at this time that the payments by the corporate executives were not income under the *Teleservice Company* and *State Farm Road* rationale because Fairchild was not in the business of auto leasing, the court does not believe that such a fact is determinative. The *Brady* materials demonstrate that the Internal Revenue Service itself has contended in its adjustments for the years in question as well as for 1973 through 1975 (*See* documents 3 and 8, Paper No. 86), that the payments made by the corporate executives were, in fact, income to the corporation. It does not become the Government to argue on a criminal indictment that the payments, under the substan-tive tax law, were not income when, in fact, that is *exactly* what the Internal Revenue Service as an institution has contended they are. *Cf. United States v. Critzer,* 498 F.2d 1160 (4th Cir. 1974).

In any event, this court is satisfied that the payments by the corporate executives, if made to Fairchild, were income to the corporation and could not have been "properly chargeable to the capital account." This being so, the Government's "form" argument falls.

## II. *Substance*

As the United States Attorney has stated, "the 'form' is independent of the motivation of the defendant corporation to devise a 'scheme' to generate monies so that the corporation [could] make illegal political contributions."[5] When the "scheme" to generate monies with which to make illegal political contributions is injected into the allegation as an integral part of the Government theory of the underlying tax law, the result is the Government's "substance" argument.

The essence of the Government's "substance" theory, as the court now understands it, is that the underlying purpose of the purchase of the automobiles by the defendant corporation was to make illegal political contributions. The Government then reasons that the automobiles were not in "substance" automobiles at all, but were merely disguised political contributions at the moment monies were paid out by the corporation to purchase the respective corporate automobiles.[6] The reasoning of the Government then concludes that since illegal political contributions are not deductible,[7] it follows that disguised political contributions (the corporate automobiles) are not deductible in the form of depreciation. Under the Government's "substance" theory, the section of the Internal Revenue Code relating to depreciation, 26 U.S.C. § 167, is not even applicable because the

---

**5.** 1/5/79, Tr. 22.

**6.** *See e. g.* 1/30/79, Tr. 1772–3; Government's "Supplemental Memorandum In Opposition to Motion For Judgment of Acquittal (Paper 94 at 5–7).

**7.** 26 U.S.C. § 162; 1/5/79, Tr. 22.

corporate automobiles (to the extent of the annual payments made or agreed to be made to the corporation by the corporate executives on account of the cars) are not capital assets at all, but instead are political contributions.[8]

Citing *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the Government asserts that the court must allow the jury to determine factually whether the substance of the entire series of transactions relating to the corporate automobiles was that the automobiles at the time of their respective acquisition were merely political contributions (to the extent of the present or future payments by the corporate executives) rather than depreciable capital assets. In *Gregory*, the Supreme Court looked through a sham corporate reorganization under which a new corporation was created for the sole purpose of achieving a nontaxable transfer to the taxpayer of certain corporate stock. The Court analyzed the situation as follows:

"Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death."

293 U.S. at 469–470, 55 S.Ct. at 267–268.

██ The factual circumstances of each case dictate the outcome wherever a "form" versus "substance" question occurs in the

application of the tax law. The court has found no case, and the parties have not cited a case, which on its facts is remotely similar to those facts outlined by the United States Attorney in his opening statement. General language of the courts describing the principles utilized by them in deciding a "form" versus "substance" question is instructive, however. In *Commissioner of Internal Revenue v. Court Holding Company*, 324 U.S. 331 at 334, 65 S.Ct. 707 at 708, 89 L.Ed. 981 (1945) the Court said:

"The incidence of taxation depends upon the substance of a transaction . . . the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale is relevant."

In *Carlton v. United States*, 385 F.2d 238 at 241 (5th Cir. 1967) the court said:

"While it is true that the incidence of taxation is to be determined by viewing the entire transaction as a whole, . . . that rule does not permit us to close our eyes to the realities of the transaction and merely look at the beginning and end of a transaction without observing the steps taken to reach that end.

. . . . .

The requirement is that the transaction be [re]viewed in its entirety in order to determine its reality and substance, for it is the substance which decides the incidence of taxation."

Again, in *Freeman v. Commissioner of Internal Revenue*, 303 F.2d 580 at 584 (8th Cir. 1962), it was said:

"It is quite true that in matters of tax liability, as in other fields, substance is generally to be preferred to form. But it is not correct to say that the form which a transaction takes is unimportant from the standpoint of tax liability. Indeed in many instances the form of a transaction is determinative of tax consequences. If a taxpayer having a choice of methods of accomplishing an economic or business result pursues a particular means to accomplish his ends, he must abide by the tax

8.  1/30/79, Tr. 1755–61, 1/29/79, Tr. 1479–81.

**1294**

consequences resulting from his choice of methods, even though had he made another choice, the tax consequences could have been less severe or even nonexistent." (citations omitted).

Conceptually, the court has great difficulty in understanding the Government's position. It is not difficult to conceive of the creation of an empty corporate shell, whose sole purpose is to serve as a conduit for the transfer of property from one taxpayer to another, as being part of a transaction which, in substance, constitutes a taxable transfer of that property from the one taxpayer to the other taxpayer, rather than a nontaxable transfer of the property in the form of a corporate reorganization from the corporate taxpayer to the sham corporation and thence, through the dissolution of the sham corporation, to the other taxpayer who is the sole stockholder of the sham corporation, see *Gregory, supra.* Neither is it difficult to conceive that a transfer of a parcel of land could be determined to be in substance a sale for cash, rather than a nontaxable exchange of land for other land of a similar kind, see *Carlton v. United States, supra.*

■ It is quite a different thing to convert a capital asset (the corporate automobiles) into political contributions when, in fact, the automobiles remained titled in the corporation, the automobiles were never themselves used in political campaigns but were, on the contrary, used by the corporate executives for both personal use and for corporate business use, and when, in fact, the corporate automobiles actually existed and were actually paid for, at least initially, by corporate funds. To ignore the tangible reality of the corporate automobiles and to transform them, as Cinderella's good fairy, from a glistening coach to the ignominious pumpkin of political contributions is to turn the doctrine of "form" versus "substance" on its head and create a fairy tale of unreality. If the automobiles here in question had been merely fictitious titles and had never existed, or had they not been actually purchased by the defendant corporation, or

had they been placed on blocks and never utilized, or had they been donated by the corporation for use by partisan political organizations or candidates, the case, under an appropriate indictment, would be a far different one and would allow in all likelihood a successful utilization by the Government of a "substance" over "form" argument. Under the facts which the United States Attorney contends he can prove, the long and the short of it is that the "substance" of the series of transactions cannot rationally be held to result in a transformation of the automobiles into political contributions. The intent of the defendants to generate funds by the use of the "automobile scheme" to be used for illegal corporate political contributions does not require, nor does it allow, the court to close its eyes to the manner by which the funds were generated. The ultimate aim of the defendants to make illegal corporate political contributions, even if that aim is proven as alleged by the Government, does not require nor allow the telescoping of the entire transaction into that aim.

The Government has not based its arguments in opposition to the motion for a judgment of acquittal on 26 U.S.C. § 167.[9] Although at one time the Government appeared to contend that the corporate automobiles were not properly depreciable because they were not used in the corporate trade or business under 26 U.S.C. § 167(a)(1) to the extent that the corporate executives made or intended to make payments on account of the automobiles,[10] the Government has not contended that the automobiles are beyond the scope of depreciation deductions allowed by 26 U.S.C. § 167(a)(2). Instead, the Government has doggedly asserted that the automobiles, in substance, were not automobiles but were political contributions and therefore not depreciable in any event.

This court does not intend to theorize whether it is possible to construct a theory, not advanced by the Government, under which the automobiles, although producing

---

**9.** *See e. g.* 1/30/79, Tr. 1755–6, 1767, 1770–1.

**10.** *See* 1/29/79, Tr. 1497–8; 1/30/79, Tr. 1780.

money for the corporation with which it could make illegal political contributions, would not be depreciable under § 167(a)(2) either because in substance the automobiles were not intended to produce a profit, *see e. g. Yanow v. Commissioner of Internal Revenue,* 44 T.C. 444, *aff'd* 358 F.2d 743 (3rd Cir. 1966), or because to allow the depreciation deductions would contravene sharply defined public policy against certain corporate political contributions, *see e. g. Dixie Machine Welding and Metal Works Inc. v. United States,* 315 F.2d 439 (5th Cir. 1963).

In conclusion, the court sees the arguments of the Government to be an attempt to place a square peg in a round hole. Assuming the Government proved beyond a reasonable doubt all of the facts which it alleged in its opening statement, the arguments advanced by the Government, when applied to those facts, would not allow convictions under the indictment to stand. The motion for a judgment of acquittal based on the opening statement of the Government will be granted.

It is so ORDERED this 7th day of February, 1979.