_____

No. 96-1204
_____

EPCO, Inc. and Subsidiaries,      *
                                  *
          Petitioner,             *
                                  *   On Petition for Review
     v.                           *   of a Decision of the
                                  *   United States Tax Court.
                                  *
Commissioner of Internal          *
Revenue,                          *
                                  *
          Respondent.             *

                        _____

                Submitted:  November 21, 1996

                   Filed:  January 6, 1997
                        _____

Before RICHARD S. ARNOLD, Chief Judge, MAGILL, Circuit Judge, and SACHS,[*]
     District Judge.
                        _____

RICHARD S. ARNOLD, Chief Judge.


     Imperial Utility Corporation, a wholly owned subsidiary of EPCO, Inc., together with Brooks McArthy, a developer, paid for the construction of a sewer pipeline to service a tract of land owned by McArthy on which he planned to develop a mobile home park.  McArthy contributed $200,000 to the construction of the sewer line, which is owned by Imperial.  The Commissioner of Internal Revenue found a deficiency in EPCO's 1989 federal income tax based on Imperial's failure to report a portion of this contribution as

_____

     [*]The Hon. Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation.

gross income.  (EPCO and its subsidiaries filed a consolidated return.)
EPCO then petitioned the Tax Court for a redetermination of the tax, and
the Tax Court upheld the Commissioner's determination.  Upon EPCO's motion,
the Tax Court reconsidered its decision and again held for the
Commissioner.  This appeal followed.  We affirm the Tax Court on the main
substantive issue, whether McArthy's contribution resulted in income to
Imperial, but remand for further proceedings on the proper amount of that
income.

## I.

In the mid-1980s, Brooks McArthy began to develop a mobile home park
upon a tract of land that he owned in Jefferson County, Missouri.  To
provide sewage service to the property, as Missouri law requires, McArthy
had two feasible options.[1]  First, he could have constructed, at his own
expense, an on-site mechanical waste treatment facility.  In the
alternative, he could have had the waste treated at a plant, owned by
Imperial, 2 1/2 miles north of the park.  This option required the
construction of a mainline extension from the plant to the park as well as
the expansion of the plant to handle the additional sewage from the park.
McArthy consulted with Imperial on which option to choose.

Each option had its disadvantages.  The on-site facility would have
been unsightly, somewhat noisy, and potentially malodorous.  In addition,
the facility would have discharged the treated waste into a so-called
"losing stream," which is defined as one which loses at least 30 per cent.
of its flow into a groundwater system.  As a result, "the discharge
effluent . . . would have emptied into

---

[1]Another possibility - treating the waste in a three-to-five
acre on-site open-air lagoon using microbes to break down and
purify the waste - would have required McArthy to acquire
additional land, and McArthy abandoned this possibility without
inquiring into the possibility of purchasing land that was adjacent
to his property.

a losing stream . . . at a point upstream from preschool playgrounds, fishing lakes, homes, churches, and schools." Appellee Br. 4. Because of this potential environmental hazard, the Missouri Department of Natural Resources preferred the mainline sewer extension, though it would have approved either method.

The primary disadvantage of the mainline-extension alternative was its cost, which turned out to be more than three times the $150,000 cost of the on-site facility. Imperial would have earned the same amount of income ($18 per month per mobile-home pad) from the McArthy property regardless of which method was chosen.[2] Nevertheless, McArthy and Imperial decided to build the sewer line and agreed to share the cost of construction.[3] McArthy placed $200,000 in an escrow account to be used to finance the construction of the line, and the balance of the cost was to come from Imperial. Withdrawals from the escrow required the signatures of both McArthy and the president of Imperial, and owner of EPCO, Eugene Fribis. According to the contract, the $200,000 contribution was to replace "tap-on fees" that the Missouri Public Service Commission authorized Imperial to charge the owners of mobile-home pads for connecting their property to sewage service. Because the $200,000 was likely to exceed the total of the authorized tap-on fees for the McArthy property, McArthy and Fribis also agreed to credit any excess contribution to the tap-on account of adjoining property owned by another corporation.[4]

The total project cost $540,000. Imperial spent about

---

[2]Had McArthy chosen to build the on-site treatment facility, EPCO would still have been responsible for operating the facility and would have earned its monthly fee for this service.

[3]Imperial's president testified that it would not have built the sewer line without McArthy's agreement to pay for part of it.

[4]McArthy eventually received $100,000 from this corporation. Thus, the entire project cost McArthy only $100,000.

$190,000 of its own money to expand the treatment capacity of its plant and $150,000 of its own money to construct the sewer line. The remaining contribution came from the escrowed funds which went to pay the general contractor and subcontractors who built the sewer line. In 1988 Imperial spent $164,375 of the $200,000 on the sewer line and reported the contribution as income. EPCO also took a depreciation deduction on the part of the sewer line that the contribution financed. In 1989, Imperial spent the remainder of the $200,000 but did not report the $35,625 as income and, consequently, also did not take the corresponding depreciation deduction.

## II.

The Internal Revenue Code allows corporations to exclude both shareholder and nonshareholder contributions to capital from their gross income. 26 U.S.C. § 118(a). Under the 1986 Tax Reform Act, "the term `contribution to the capital of the taxpayer' does not include any contribution in aid of construction or any other contribution as a customer or potential customer." 26 U.S.C. § 118(b). The Report of the House Ways and Means Committee explained that the provision's effect "is to require that a utility report as an item of gross income the value of any property, including money, that it receives to provide, or encourage . . . the provision of, services to or for the benefit of the person transferring the property." H.R. Rep. No. 99-426, 99th Cong., 1st Sess. 644 (1985). The Tax Court found, and the Commissioner argues, that the $200,000 that McArthy contributed to the building of the sewer line was a contribution in aid of construction (CIAC) and that it thus constituted taxable income that EPCO should have reported.

Two things are clear. McArthy was a customer of EPCO (or at the very least was acting on behalf of potential customers of EPCO), and his contribution aided in the construction of a line

-4-

which was to provide sewer service to McArthy's development. EPCO, however, seizes upon language in the Committee's Report that states that transfers of property to utilities by members of a particular group will normally be assumed "to encourage the provision of services . . . unless it is clearly shown that the benefit of the public as a whole was the primary motivating factor in the transfers."[5]

The "public benefit" exception, as well as the general exclusion for contributions to capital, has its origin in a 1925 Supreme Court decision which held that cash subsidies as well as land and buildings provided by the government of Cuba to a railroad company to construct a railroad in Cuba were not income within the meaning of the Sixteenth Amendment.[6] Edwards v. Cuba R.R., 268 U.S. 628 (1925). The Court reached this conclusion because it found that the payments "were not made for services rendered or to be rendered" and were not "profits or gains from the use or operation of the railroad." Id. at 633.

EPCO contends that McArthy's contributions to the sewer line

---

[5]Ibid. Neither party argues that we should disregard this exception because it does not appear in the statute itself. We would disregard it anyway were it not for the history behind the provision, which helps illuminate its meaning. The distinction between contributions to capital made by customers to procure service and contributions to achieve indirect benefits to the public at large was a familiar one in judicial decisions that preceded passage of 26 U.S.C. § 118 in 1954, and it is universally recognized that this statute was no more than a codification of judicial decisions up to that point. The post-passage preservation of the distinction is evident from such cases as Teleservice Co. of Wyoming Valley v. Commissioner, 254 F.2d 105 (3d Cir.), cert. denied, 357 U.S. 919 (1958), and its preservation in 26 U.S.C. § 118(b) is evident from the fact that 118(b) exempts only customer contributions in aid of construction from the exclusion for contributions to capital.

[6]EPCO does not argue in this Court that the contribution in question was not income within the meaning of the Sixteenth Amendment. Its argument is based solely on the statute.

-5-

were not made to encourage service to McArthy's property, but instead to benefit the public. McArthy would have gotten sewage treatment for his property regardless of the method chosen. He chose what was, both for him and EPCO, the far more expensive method of sewage treatment only because the alternative would have led to more water pollution. While EPCO obviously cannot deny that the sewage line provides its customer with sewage service, EPCO contends that McArthy's choice of the more expensive method was for the public's benefit.

We believe that the relevant inquiry is into McArthy's motivation for choosing one sewage treatment method over another. The record does not convince us that McArthy's primary motivation was an altruistic concern for the environment beyond his own development. The Tax Court found that the on-site treatment facility "would have been noisy and unsightly and would have emitted unpleasant odors, which would have detrimentally affected property values. . . . [and therefore] that McArthy chose the main- line extension because it best suited his purposes in providing sewer service to [his development]." EPCO, Inc., T.C. Memo. 1995-249, slip op. at 22-23. Thus, the Tax Court found that McArthy chose the sewer line method because of its direct benefit to McArthy's property and, consequently, the future occupants of his development.

We review this finding of fact only to determine whether it was clearly erroneous. We hold that it is not unreasonable to think that a developer seeking sewage service for his property would pay an extra $50,000 to avoid having a smelly sewage facility on the property itself, and that there was evidence to support the Tax Court's conclusion that this was, in fact, Mr. McArthy's primary motivation. This conclusion is reinforced by the provision in the contract that states that the $200,000 contribution was to be in lieu of fees that EPCO could have charged mobile home owners to connect their property to sewage service. Add to this evidence

the natural assumption that a developer acts to maximize his profit and not the general welfare, and it becomes clear that McArthy was acting as a customer of EPCO and not a public citizen when he made his contribution. Accordingly, we hold that McArthy's contribution to the construction of the sewer line was a taxable contribution in aid of construction under 26 U.S.C. § 118.

## III.

The question of how to value what EPCO got, and thus how much to include in its income, remains. The Tax Court held that $35,625 was includible in income for the year 1989 - the full amount of money paid from the escrow account that year to contractors and subcontractors working on the sewer line. These payments went to defray debts for which EPCO was liable. (McArthy was liable for them, too, but that does not change the essential point.) In general, a payment made to pay someone's debt is income to that person. E.g., Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929).

EPCO replies that this general rule does not apply where, as here, the debt paid was itself created as part of the same transaction that included the payment. Imperial would not have built the sewer line, and thus would not have contracted the $200,000 in obligations that were paid out of the escrow account, if McArthy had not agreed to contribute the $200,000 in the first place. EPCO says that what it actually received was not money or the liquidation of debts, but the sewer line, which Imperial ended up owning. The value of the line, EPCO adds, was not the $540,000 cost incurred ($340,000 from Imperial and $200,000 from McArthy), but the present value of the stream of future income expected to be realized from customers tapping on to the sewer line - an amount EPCO fixes at about $360,000. This would reduce the total amount of McArthy's contribution to EPCO's (or Imperial's) capital from $200,000 to about $20,000 (the $360,000 value of the line less the

$340,000 paid by Imperial).

We agree with EPCO that the debt payments themselves were not _ipso facto_ income to it.  See <u>Fox v. Harrison</u>, 145 F.2d 521 (7th Cir. 1944) (payment of debt not income when debt incurred as part of same transaction that envisioned the payment).  We further agree that what EPCO got out of this transaction was the sewer line.  But the question of the value of the sewer line is one of fact, and the Tax Court, the finder of fact, never reached that question, having stopped its analysis with the conclusion that what EPCO got was payment of its debts.  The income expected to be produced by the line from McArthy's mobile-home park is certainly one possible criterion of that value.  But it is not the only possible criterion.  Also relevant is the fact that $540,000 was paid for the line.  We have difficulty believing that businesspeople would pay $540,000 for an asset that, immediately upon purchase, became worth only $360,000.  The difference may be due, at least in part, to the possibility that other users might tap on to the line in the future - for example, users on the adjoining property, whose owners contributed half of the $200,000. This issue of fact needs to be explored further in the court of first instance, the Tax Court.

We agree with the Tax Court that McArthy made a contribution in aid of construction to Imperial that should have been included in Imperial's gross income.  We do not agree with that Court's holding as to the value of that contribution.  The judgment of the Tax Court is vacated, and the cause remanded for further proceedings as to valuation not inconsistent with this opinion.  The Tax Court may in its discretion allow either party to introduce additional evidence.

It is so ordered.

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.