T.C. Memo. 1999-103


UNITED STATES TAX COURT


EPCO, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 25248-93.                    Filed March 31, 1999.


<u>Juan D. Keller</u> and <u>Philip B. Wright</u>, for petitioner.

<u>James A. Kutten</u>, for respondent.


SECOND SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  This case is before the
Court on remand from the Court of Appeals for the Eighth Circuit.
<u>EPCO, Inc. & Subs. v. Commissioner</u>, 104 F.3d 170 (8th Cir. 1997),

_____

     *     This opinion supplements our opinion in <u>EPCO, Inc. &
Subs. v. Commissioner</u>, T.C. Memo. 1995-249.

affg. in part, vacating in part, and remanding T.C. Memo. 1995-249 and T.C. Memo. 1995-499.

The issue for decision is the proper amount of contribution in aid of construction income includable in petitioner's 1989 gross income. In order to decide this issue, we are required to determine the fair market value of a sewer line petitioner constructed using amounts contributed to petitioner as a contribution in aid of construction.

Petitioner, using the capitalization of income method of valuation, contends that the sewer line has a fair market value of $80,000 and that petitioner recognized no contribution in aid of construction income in 1989. Respondent, using the cost method of valuation, contends that the sewer line has a fair market value of $540,000 and that petitioner recognized $200,000 in contribution in aid of construction income in 1989.

In EPCO, Inc. & Subs. v. Commissioner, T.C. Memo. 1995-249 (EPCO I), this Court held that escrow amounts disbursed in the construction of a sewer line constituted a contribution in aid of construction under section 118(b), and, as such, were includable in petitioner's income.[1] We further held that petitioner

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

received cash in the transaction and did not receive a sewer line.

In a supplemental memorandum opinion, we considered both petitioner's Motion for Reconsideration under Rule 161 and Motion to Vacate Decision under Rule 162 and held that, while petitioner did not receive "cash" per se from the escrow account, petitioner received the benefit of the escrow funds in the same manner as if the funds had been deposited directly into petitioner's own account and were used to pay contractors to whom petitioner was directly liable. See EPCO, Inc. & Subs. v. Commissioner, T.C. Memo. 1995-499 (EPCO II).

In EPCO, Inc. & Subs. v. Commissioner, 104 F.3d 170 (8th Cir. 1997), the U.S. Court of Appeals for the Eighth Circuit affirmed in part, vacated in part, and remanded our decision in EPCO I. The Court of Appeals affirmed our finding that petitioner received a contribution in aid of construction under section 118(b), which was includable in petitioner's gross income for 1989. However, the Court of Appeals held that whatever contribution in aid of construction income petitioner received in 1989 was based on the value of a completed sewer line and not on the disbursal of escrow funds. The case was remanded to the Tax Court to determine the fair market value of the completed sewer line.

At the direction of the Court of Appeals, we now undertake to determine the fair market value of that sewer line in order to determine the amount of income, if any, which should be recognized by petitioner as a contribution in aid of construction for the 1989 tax year.

## FINDINGS OF FACT

The findings of fact are set forth in EPCO I and are incorporated herein by this reference. The stipulations and exhibits are also incorporated herein by this reference. For convenience, we shall only set forth the facts necessary to clarify the ensuing discussion.

Petitioner is an affiliated group of corporations which filed a consolidated Federal corporate income tax return for 1989. For the year at issue, EPCO, Inc. (EPCO), a Missouri corporation, was the common parent of an affiliated group which included Imperial Utility Corp. (Imperial), a Missouri corporation 100 percent owned by EPCO. During the year at issue, Eugene Fribis (Mr. Fribis) and his wife owned all of the stock of EPCO, and Mr. Fribis served as the president of both EPCO and Imperial. Imperial engages in the business of sewage collection and treatment and is regulated by the Missouri Public Service Commission (PSC).

Sometime in 1986 or 1987, Brooks McArthy (Mr. McArthy), a real estate developer, planned to develop a trailer park

consisting of 266 trailer pads.  The trailer park, named Brookshire Village Mobile Home Park (Brookshire), was to be developed in three stages.

Before commencing development of Brookshire, Mr. McArthy consulted Mr. Fribis in order to arrange sewer service.  The method of providing sewer service had to be approved by the Missouri Department of Natural Resources (DNR), an agency of the State of Missouri responsible for water quality.  Mr. Fribis told Mr. McArthy that the sewage from Brookshire could be treated by using either an onsite lagoon, an onsite sewage treatment plant, or an underground sewer line connecting Brookshire to a centralized treatment plant.

Mr. McArthy ultimately chose the third sewage treatment option which involved the construction of a sewer line connecting Brookshire to Imperial's Country Club Manor sewage treatment facility (treatment facility), 2-1/2 miles north of Brookshire. Since the northern boundary of Brookshire abutted a tract of undeveloped land owned by Interstate Development Corp. (Interstate), the completed sewer line would also bisect Interstate's land, thereby providing sewer service to any future development.

In order to determine the economic feasibility of the project, Mr. Fribis determined the costs of construction, operation, and maintenance of both the sewer line and treatment

facility upgrade and compared these expenses to the projected revenue of the sewer line by using a formula he called a "life cycle cost analysis".

Imperial is a regulated utility and its revenue from sewage collection and treatment is regulated by the PSC. At the time petitioner decided to construct the sewer line, the PSC tariff provided for a $400 "contribution in aid of construction fee" and a monthly service charge of $18 for each mobile home. The $400 fee was a one-time fee charged to occupied mobile home pads, regardless of the existence of a sewer line. Imperial was permitted to charge customers for the cost of a sewer line connecting the customers' property to petitioner's treatment facility and the cost of upgrading that treatment facility to meet any increased waste flow.

On March 11, 1988, Imperial entered into a contract entitled "Agreement for Sewer Service New Construction" (McArthy-Imperial agreement) with Mr. McArthy and Interstate. Pursuant to the McArthy-Imperial agreement, Imperial agreed to build a 2-1/2-mile sewer line extending from Brookshire through Interstate's property to the treatment facility, thereby allowing service to both properties. Imperial also agreed to upgrade its treatment facility to handle the anticipated increase in waste. The McArthy-Imperial agreement also provided for Mr. McArthy to pay Imperial $200,000 in "tap-on fees in accordance with the Sewer

Company's tariff on file with the Missouri Public Service Commission".[2]

Additionally, the McArthy-Imperial agreement provided that the escrow deposit would be credited toward the $400 per pad "contribution in aid of construction fee" permitted by the Sewer Service Rules. As a result, Imperial waived fees, which are usually borne by the customer, to connect individual mobile homes in Brookshire to the sewer system in exchange for the $200,000 escrow contribution.

According to the McArthy-Imperial agreement, Mr. McArthy deposited the $200,000 into an escrow account. In addition, Mr. McArthy and Interstate agreed that $100,000 of Mr. McArthy's deposit was for the development contemplated by Interstate, with the understanding that Interstate would later reimburse Mr. McArthy. Pursuant to the agreement, Interstate executed a deed of trust in the amount of $100,000 in favor of Mr. McArthy. Interstate subsequently paid Mr. McArthy the $100,000.

Imperial contracted with McClanahan Contracting (McClanahan), a partnership of which Mr. Fribis was a partner, to construct the sewer line and upgrade the treatment facility at a

---

[2] Mr. Fribis drafted the contract and often used the terms "tap-on fee" and "contribution in aid of construction" interchangeably. By reference to the Sewer Service Rules, Mr. Fribis intended that the term "tap-on fee" used in the contract would correspond to the term "contribution in aid of construction" used in the Sewer Service Rules.

total cost of $540,000. The cost of the sewer line connecting Brookshire to the treatment facility was $350,000, with $150,000 of those construction costs paid by Imperial and the remaining $200,000 paid from the escrow fund. Imperial paid the total $190,000 cost of the treatment facility upgrade. Construction of the sewer line and the upgrade of the treatment facility was completed in April 1989.

At the time that McClanahan was constructing the sewer line in 1988 and 1989, Fribis-Wiley, a civil engineering firm of which Mr. Fribis is president, was preparing plats for the development of the Interstate property. Interstate called its proposed development Pine View Acres (Pine View) and initially planned to develop 326 lots for single family residences. Fribis-Wiley prepared the plans for Pine View's first phase of development, which ultimately included 37 DNR-approved lots.

The sewer lines within Brookshire were constructed at Mr. McArthy's expense, and Mr. McArthy retained title to them and responsibility for their maintenance. Imperial owns the sewer line connecting Brookshire to the treatment facility. The sewer line now serves additional customers other than those in Brookshire and Imperial continues to receive fees from these additional customers.

Of the $200,000 in escrow funds, $164,375 was disbursed in 1988 and $35,625 was disbursed in 1989. Petitioner included in

income the $164,375 of disbursements made from the escrow account during 1988 on its 1988 Federal corporate income tax return. Petitioner did not include in income the 1989 disbursements from the escrow account totaling $35,625 on its 1989 Federal corporate income tax return.

Petitioner included the $164,375 paid to "Price/McClanahan" in its cost basis of the sewer line (referred to by petitioner as the "Brookshire Trunk Sewer Line") on the depreciation worksheet attached to its corporate income tax return and, with regard to this amount only, claimed depreciation in the amount of $6,164.05 for 1988 and $11,866.27 for the 1989 tax year. Petitioner claimed a total cost basis in the Brookshire Trunk Sewer Line in the amount of $373,514.44 on its 1989 consolidated Federal corporate income tax return[3] and claimed total depreciation on the sewer line in the amounts of $15,279.92 and $30,757.31 for the 1988 and 1989 tax years, respectively.

OPINION

General Discussion

Gross income generally means all income from whatever source derived. See sec. 61(a). Section 118(a) provides an exception to the general rule and states: "In the case of a corporation,

---

[3]  There is no explanation in the record as to the difference between the cost basis of the sewer line as reported on petitioner's corporate income tax return and the stipulated cost of $350,000.

gross income does not include any contribution to the capital of the taxpayer."  Section 118(b), however, <u>excludes</u> a "contribution in aid of construction" from the definition of a "contribution to the capital of the taxpayer".

A taxpayer must include in gross income the value of property received.  See sec. 1.61-1(a), Income Tax Regs.  The determination of fair market value is a question of fact to be resolved from a consideration of all relevant evidence in the record and the appropriate inferences to be drawn therefrom.  See <u>Estate of Jung v. Commissioner</u>, 101 T.C. 412, 423-424 (1993). "Fair market value" has been defined by this Court to mean the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of the relevant facts.  See <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 217 (1990).

## Methods of Valuation

There are generally three kinds of valuation methods used to determine fair market value: (1) The comparable sales method, (2) the capitalization of income method, and (3) the cost method. See <u>Marine v. Commissioner</u>, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991).

Both parties agree that the comparable sales method of valuation is not applicable to the valuation of the sewer line in question because there are no sales of sewer lines to which we can compare it. Two generally accepted methods of valuation remain: (1) The capitalization of income method; and (2) the cost method.

## Respondent's Position

Respondent contends that the sewer line should be valued by using the cost method of valuation. The total cost of the sewer line and treatment facility upgrade was $540,000. Included in this amount was the $350,000 cost of the sewer line itself, $200,000 of which was financed by the deposit in escrow. Imperial paid the total $190,000 cost of upgrading the treatment facility. Therefore, if we accept respondent's cost valuation approach, since the fair market value of the sewer line and treatment facility upgrade is the cost, in this case, $540,000, and Imperial contributed only $340,000 towards its construction and upgrade, all of the $200,000 expended from escrow would be includable in petitioner's income.

## Petitioner's Position

Petitioner contends that the capitalization of income method of valuation is the only fair and accurate method for determining the fair market value of income-producing property like a sewer line. The capitalization of income method determines fair market

value by determining an applicable discount rate and discounting to present value a property's anticipated income and any salvage value which may remain at the end of the property's economic life.  See United States v. Dresser Indus., Inc., 324 F.2d 56 (5th Cir. 1963); Concord Control, Inc. v. Commissioner, 78 T.C. 742 (1982), affd. in part and remanded 615 F.2d 1153 (6th Cir. 1980).

Using the capitalization of income method of valuation, petitioner values the sewer line at $80,000.  As we understand petitioner's argument, since petitioner contends the fair market value of the sewer line is $80,000 and petitioner contributed $150,000 of its own funds to construct the sewer line, none of the $200,000 expended from escrow would be includable in income for 1989.

Expert Testimony

In support of the use of the capitalization of income method of valuation, petitioner used Daniel Lee Jones (Mr. Jones) as an expert witness.  Petitioner contends that Mr. Jones is an expert in the valuation of the subject sewer line based on his knowledge and expertise.  Respondent disagrees and objects to the receipt of Mr. Jones' report into evidence.  The report was received into evidence subject to respondent's objections noted in the record.

Mr. Jones is a certified public accountant (C.P.A.) with the certified public accounting firm of Daniel Jones & Associates,

which provides accounting services to EPCO. In the course of his firm's work for EPCO, Mr. Jones reviews individual financial statements and corporate tax returns of EPCO and its subsidiaries. Mr. Jones' involvement with petitioner began in 1992.

In order to become familiar with petitioner's operations in 1988 and 1989, Mr. Jones reviewed EPCO's financial data from those years. The data consisted of historical financial statements and Federal income tax returns.

At trial, petitioner orally moved that the Court recognize Mr. Jones as an expert, for the purposes of the valuation of the sewer line. Respondent objected to Mr. Jones' being qualified as an expert and we took respondent's objection under advisement. We find that Mr. Jones does not have specific expertise in valuing sewer lines.

Mr. Jones has neither lectured nor published articles on the subject of valuation. Mr. Jones has not attended courses or seminars conducted by an appraisal organization, nor has he been certified by an appraisal society. Additionally, Mr. Jones testified that he was not familiar with the Uniform Standards of Professional Appraisal Practice. Mr. Jones has no prior experience valuing sewer lines or, as a matter of fact, any type of public utility. Mr. Jones' prior valuation experience primarily consists of valuing underlying collateral for loan

applications to insure that the collateral provided adequate security.

Though we find that Mr. Jones has no expertise in the specific area of valuing sewer lines, we do find that Mr. Jones has professional knowledge acquired from prior valuations using acceptable methods of valuation; i.e., income capitalization.

We consider his testimony in that light and accept his testimony under those circumstances. We must now decide whether Mr. Jones' general valuation experience is helpful to this Court in arriving at the fair market value of the sewer line in question.

Though expert opinion is admissible and relevant to a valuation question and is intended to help the Court understand areas requiring specialized training, it does not always aid the Court in determining the value of property. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

This Court will evaluate expert testimony in light of the demonstrated qualifications of the expert and on the basis of all other credible evidence in the record. See Estate of Newhouse v. Commissioner, 94 T.C. at 217. This Court is the trier of fact and is not bound by expert opinion when that opinion contravenes our judgment. See Estate of Newhouse v. Commissioner, supra. Moreover, because valuation is necessarily an approximation, it is not required that the value we determine be one as to which

there is specific testimony, provided that it is within the range of figures that properly may be deduced from the evidence.  See Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178.  We may also be selective in the use of any portion of an expert opinion. See Parker v. Commissioner, 86 T.C. 547, 562 (1986).

According to Mr. Jones' testimony and his report received into evidence, the fair market value of the sewer line using the capitalization of income method of valuation is $80,000.

Mr. Jones testified that the sewer line generated annual revenue in the amount of $60,912 and that the sewer line's annual operating expenses totaled $43,303.  Based on these figures, Mr. Jones calculated that the sewer line generated annual net earnings in the amount of $17,609.  Mr. Jones then applied a discount rate of 22 percent because, in Mr. Jones' opinion, a willing buyer would expect a 22-percent return on this investment because of the type of risk involved.  Mr. Jones did not include the $200,000 deposited in escrow or potential tap-on fees from future Pine View customers in his calculations of the proceeds from the sewer line.

We have the following reservations concerning Mr. Jones' report:  (1) Mr. Jones contends that the escrow funds, if they have any bearing at all on the valuation of the sewer line, should be discounted as though they were tap-on fees received

over time; (2) Mr. Jones applied a discount rate that is unrelated to the original transaction, circumstances, or original parties; and (3) Mr. Jones characterized the construction of the sewer line as a "bad investment" and contended that cost overruns made the cost method approach to valuation inappropriate to this sewer line.

Mr. Jones argues that the application of respondent's method of valuation is inaccurate in this case because it values the funds in escrow as of 1989, the date the funds became totally available to petitioner. Mr. Jones contends that if the escrow amounts were to enter into the valuation at all, the funds should be discounted as though the funds represented actual customer tap-on fees to be paid to petitioner over a course of years.

We do not agree. The escrow funds were available and used for construction of the sewer line in 1988 and 1989 without waiting for Brookshire customers to be "on-line". The sewer line was fully completed and operational as of April 1989.

Mr. Jones also applied a 22-percent discount rate to the sewer line income as the rate a willing buyer or investor would expect because of the risk of this type of investment. Mr. Jones' application of a 22-percent discount rate follows from several assumptions that have no foundation in the record, and we remain unconvinced that the application of a 22-percent discount

rate adequately reflects the rate of return an investor could expect from a PSC-regulated sewer line.

Mr. Jones has also characterized the sewer line as a bad investment and contends that valuing the sewer line at cost would be unfair to petitioner. We do not believe that petitioner considered the sewer line a bad investment when it was constructed. Mr. Fribis prepared a life cycle cost analysis to determine the cost effectiveness of constructing the sewer line. The analysis included construction costs and operating expenses petitioner expected to incur during the life of both the sewer line and the treatment facility.

We infer that had the life cycle cost analysis supported petitioner's valuation position it would have been produced at trial. Since the analysis was not produced at trial, we surmise that the analysis did not support petitioner's litigating position. This Court can infer that testimony which was not produced at trial would not have been favorable to a taxpayer. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Whether petitioner now believes that the sewer line was a bad investment or not, the appropriate time of valuing the sewer line is on its date of completion. As a general rule, the valuation of property is based on facts known at the date of valuation, without regard to hindsight. See Estate of Gilford v.

Commissioner, 88 T.C. 38, 52 (1987). Any capitalization of income valuation analysis must take into account the events which the parties expected at the time of valuation and not whether those events were, or were not, ultimately realized several years later.

Mr. Fribis was the president of Imperial, EPCO, and Fribis-Wiley. Mr. Fribis knew that petitioner had built the sewer line to bisect Pine View and that Pine View was planning further developments in addition to those already approved by the DNR. That knowledge not only affected the decision of whether or not to construct the sewer line, but also affected petitioner's profit expectations at the time the sewer line was constructed.

Because we are concerned with the valuation of the sewer line when it was completed around April 1989, we cannot assign a fair market value to the sewer line based on a method of valuation having so little relation to the facts as they existed. The capitalization of income method of valuation is practical only when income attributable to the property can be adequately estimated on the date of construction.

Mr. Jones' report values the sewer line without regard to the knowledge held by Mr. Fribis, and by extension petitioner, and without regard to the profit expectations such knowledge surely created on the date of valuation. It is clear that petitioner, as a willing seller not being under any compulsion to

sell and having a reasonable knowledge of the relevant facts at the time, would not have sold the sewer line on which Imperial and others had just spent $350,000 to a buyer for only $80,000 at the time of completion in April 1989.

Furthermore, the portions of Mr. Jones' testimony concerning cost overruns in the construction of the sewer line are vague and unsupported by the record.

Finally, petitioner contends that Mr. Jones' testimony makes a prima facie case for petitioner's valuation which then must be rebutted by respondent. We reject this contention. It is well established that this Court is not required to accept the testimony of alleged expert witnesses as "gospel" and that we are entitled to evaluate testimony by our own judgment and in light of the entire record. See Cupler v. Commissioner, 64 T.C. 946, 956 (1975). Mr. Jones' report and testimony is therefore of little use to this Court in such valuation.

Cost Method of Valuation

Respondent contends that the sewer line should be valued by use of the cost method.[4] Respondent contends that the best

---

[4] It is unclear from the record, but respondent seems to have, at times, equated "replacement cost" with historical cost. The replacement cost method of valuation uses the projected cost of replacement to value property. The replacement method bears some resemblance to the historical cost method in that the replacement cost method typically uses actual cost figures as a primary information source. We believe, however, that in this case, actual cost, and not replacement cost, is the better

(continued...)

direct evidence of the value of the sewer line is its cost and that the actual cost of an asset is direct evidence of its fair market value on the date of construction.  Cost is cogent evidence of value.  See Guggenheim v. Rasquin, 312 U.S. 254, 258 (1941).  This Court has held that cost may be considered in valuing property.  See Cupler v. Commissioner, supra at 955.

In an attempt to discredit the use of the cost method of valuation, Mr. Jones calculated the cost per foot incurred by petitioner to construct the sewer line in question and projected that cost to all of Imperial's sewer lines contending that respondent's use of the cost method of valuation would result in an unreasonable, overall valuation of Imperial at about $10 million.  Mr. Jones' extrapolation is irrelevant. It is our task to value a single sewer line and not Imperial as a whole.  We do not believe that Imperial's older sewer lines, or any lines constructed more recently than the sewer line in question, would have any direct relationship to our valuation of the subject sewer line.  Individual sewer lines would certainly have different operating costs and different construction costs, and, therefore, would be of different value to Imperial.  If the sewer line in question cost more to construct than Imperial's other

[4](...continued)
valuation method.

sewer lines, we must then consider the reasons why petitioner would construct such a sewer line.

As discussed above, Mr. Fribis testified that he completed a life cycle cost analysis before constructing the sewer line. A businessman such as Mr. Fribis, with access to information about the development plans of both Brookshire and Pine View, would certainly not decide to construct a sewer line if it seemed to be a bad investment on the information available to him at that time. It is inconceivable to us that EPCO would spend $150,000 of its own money, plus $200,000 contributed by other business people, to construct an asset worth only $80,000 when completed.

At trial, Mr. Fribis sought to minimize his prior knowledge of the Pine View development. Mr. Fribis testified that he believed that the property would not be fully developed as long as Interstate owned the property and that he was skeptical that the full development of Pine View could have proceeded as planned. Though later events certainly justified this view, there were no clear indications at the time of the sewer line construction of Interstate's later financial difficulties. Testimony has shown that developers generally construct housing developments in stages. That future development did not go according to either Fribis-Wiley's or Interstate's plan does not affect the valuation of the sewer line at the time of construction.

According to the terms of the McArthy-Imperial agreement, Imperial agreed to waive "tap-on" fees up to $200,000. Clearly, Imperial expected something of value in exchange for its waiver of fees. Mr. Fribis testified that Imperial has waived tap-on fees for other customers in the past in exchange for easements over property Imperial needed to construct a sewer line. In this case, Imperial received $200,000 in lieu of future tap-on fees.

This Court has noted that the determination of the fair market value of property on a given date is a question to be resolved on the basis of the entire record. See McShain v. Commissioner, 71 T.C. 998, 1004 (1979). In this case, we find that the record clearly supports the use of the cost method of valuation.

We have considered the cost method of valuation in light of all relevant evidence: (1) The cost of construction; (2) petitioner's expectations at the time of valuation; and (3) the positioning of the sewer line through Pine View. The knowledge, actions, and expectations of petitioner illustrate that the cost of construction is in these circumstances indicative of the fair market value of the sewer line. Therefore, we find that the price at which the sewer line would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, is the cost of construction.

Though the sewer line may be considered an income-producing property in itself, the capitalization of income approach is of no use to this Court unless the income can be adequately estimated at the time of valuation, the time when the completed sewer line was placed in service.[5] We find that the income from the sewer line could not be adequately estimated by using Mr. Jones' approach. We find that the cost method of valuation is appropriate in this case.

The cost of construction of the sewer line has been fully stipulated. The cost of the sewer line connecting the treatment facility to Brookshire was $350,000. Imperial paid approximately $150,000 of its own funds, and the remainder consisted of the $200,000 disbursed from the escrow account.

We find that the cost of the sewer line is its fair market value and hold that the cost of the sewer line, less the amount petitioner paid, is includable in petitioner's gross income as a contribution in aid of construction.

---

[5] It should be noted that in Exhibit 9, received in evidence in EPCO I, petitioner estimated that the Brookshire sewer line would have produced $360,157 of income discounted over 50 years, based on an individual $18-monthly rate for 266 trailer pads. The undated exhibit was prepared subsequent to the construction of the sewer line and does not take into account either the $200,000 of contribution in aid of construction funds disbursed from escrow, the possibility of potential customers from Pine View, or a possible increase in the monthly sewer rate.

Respondent's Amended Answer

On November 12, 1997, respondent filed an Amended Answer requesting that this Court redetermine petitioner's deficiency in Federal corporate income tax for the 1989 tax year to be $4,537, plus an increased deficiency pursuant to section 6214(a) in the amount of $56,839. Respondent apparently based the increased deficiency contained in the Amended Answer on the Court of Appeals' decision that the income petitioner received is measured by the value of the sewer line which was completed in 1989.

We do not agree with respondent on this issue. Though the sewer line was completed in 1989, we do not read the Court of Appeals' decision as mandating that petitioner include in income for 1989 all of any contribution in aid of construction income received in connection with the sewer line. Petitioner included in its income for 1988 the $164,375 disbursed from escrow in 1988 and used in that year for construction of the sewer line. We are not persuaded that the accession to value realized during 1989 would be greater than $36,625, a sum commensurate with the amount disbursed from escrow in 1989 to complete construction of the sewer line. Therefore the inclusion in petitioner's income for 1989 should be limited to $36,625.

To reflect the foregoing,

Decision will be entered

under Rule 155.